**Mark WILDMAN, Plaintiff, Appellee,**

v.

**LERNER STORES CORPORATION, et al., Defendants, Appellants.**

**Mark WILDMAN, Plaintiff, Appellant,**

v.

**LERNER STORES CORPORATION, et al., Defendants, Appellees.**

**Nos. 84–1394, 84–1463 and 84–1462.**

United States Court of Appeals, First Circuit.

Argued June 3, 1985.

Decided Aug. 28, 1985.

Rehearing Denied in No. 84–1462 Sept. 23, 1985.

Harvey B. Nachman, Santurce, P.R., with whom Antonio Moreda Toledo, Hato Rey, P.R., and Nachman & Fernandez-Sein, Santurce, P.R., were on brief, for Mark Wildman.

Carl A. Schwarz, Jr., and Raymond L. Vandenberg, New York City, with whom Kenneth A. Margolis, New York City, Christopher A. D'Angelo, Vicente J. Antonetti, Santurce, P.R., and Finley, Kumble, Wagner, Heine, Underberg, Manley & Casey, New York City, were on brief, for Lerner Stores Corp. and Lerner Shops Intern.

Before COFFIN, BOWNES and DAVIS,[*] Circuit Judges.

[*] Of the Federal Circuit, sitting by designation.

BOWNES, Circuit Judge.

Before us are cross-appeals from a jury verdict finding defendants liable for willfully violating the Age Discrimination In Employment Act, 29 U.S.C. §§ 621–634 (1975 & Supp.1984) (ADEA), and also liable under two Puerto Rico statutes; the Puerto Rico Anti-Discrimination Statute, P.R.Laws Ann. tit. 29, § 146 (Supp.1983) and the Puerto Rico Severance Pay Statute, P.R. Laws Ann. tit. 29, § 185a (Supp.1983). The amount of damages to date of judgment was stipulated by the parties.

Defendants' appeal, which we consider first, raises four issues: whether there should have been a judgment n.o.v.; whether there should have been separate trials on the federal and Puerto Rico statutes; whether the closing argument by plaintiff's counsel deprived defendants of a fair trial; and whether the award of attorney's fees to plaintiff's counsel was excessive.

I

1. *The Denial of Defendants' Motion for Judgment N.O.V.*

The principles controlling our review of the denial of a motion for judgment n.o.v. are well established. We cannot determine credibility, resolve conflicting testimony, or evaluate the weight of the evidence. Judgment n.o.v. should be granted only when the evidence could lead reasonable men to but one conclusion. *Fishman v. Clancy,* 763 F.2d 485, 486 (1st Cir.1985); *Cazzola v. Codman & Shurtleff, Inc.,* 751 F.2d 53, 54 (1st Cir.1984); *Rios v. Empresas Lineas Maritimas Argentinas,* 575 F.2d 986, 989 (1st Cir.1978). And our review of the evidence and inferences fairly drawn therefrom must be made in the light most favorable to the prevailing party. *Robinson v. Watts Detective Agency, Inc.,* 685 F.2d 729, 732 (1st Cir.1982), *cert. denied,* 459 U.S. 1105, 1204, 103 S.Ct. 728, 1191, 75 L.Ed.2d 436 (1983); *DeVasto v. Faherty,* 658 F.2d 859, 861 (1st Cir.1981).

We start with the undisputed facts. Plaintiff, Mark Wildman, was, without prior warning, asked to resign by the chief executive officer of Lerner Stores, Karl Margolis, in October 1981 when he was in New York City at a company merchandising meeting. At that time he was sixty-one years of age. Wildman refused to resign and, after returning to Puerto Rico, wrote a letter demanding the payment of $1,500,-000 or reinstatement. He was then notified that he was fired for cause. Wildman's annual salary at the time of his discharge was $60,000. He was also entitled to certain fringe benefits, including a vested interest in the company retirement fund. Wildman was replaced with a thirty-six year old man at an annual salary of $48,000 and with smaller fringe benefits. Based on these facts, Wildman made out a prima facie case of a discharge based on age discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 688 (1973); *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1014 (1st Cir.1979). The liability issue was whether plaintiff was discharged because of his age or "some legitimate, nondiscriminatory reason." *McDonnell Douglas* 411 U.S. at 802, 93 S.Ct. at 1824.

Plaintiff's evidence can be summarized as follows. He opened the first Lerner store in Puerto Rico in August 1959. Under his aegis, the number of stores grew to twenty-six in 1981. In 1973, he was appointed vice-president in charge of the Carribbean region (Puerto Rico and St. Thomas) and continued in that capacity until his discharge. According to plaintiff's testimony, exhibits he introduced and the testimony of witnesses Friedman, Dasz Castrillo, and Sanchez, the Puerto Rico stores were profitable and well managed. In 1978, policy changes were made by defendants. The man who helped start the company, Harold Lane, Sr., and his son were forced to retire. At least eight elderly executives were asked to resign or were fired because of their age. After the retirement of Lane, Sr., Karl Margolis became chairman of the board and chief executive officer of Lerner Stores. Margolis repeatedly, at least three or four times a year, asked Wildman when he was going to resign and reminded him that he was not getting any younger. Wildman finally told Margolis that he would retire when Margolis did. Margolis told Wildman, "as long as I'm here you will have a job, I promise you that."

Defendants' articulated nondiscriminatory reason for discharging plaintiff was that he did not promptly fire an employee, Loida Marti, who had invested $10,000 in a store that Margolis felt was in direct competition with Lerner. Marti was the principal buyer for the Lerner Puerto Rico stores. There is no question that she owned an interest in a store that sold essentially the same type of merchandise as did the Lerner Stores. There was testimony from which it could be found that the merchandise was cheaper and of inferior quality than that sold by Lerner. The store was located in the same shopping area as a Lerner Store, about a ten minute walk away. The testimony was conflicting as to whether the store was in competition with the Lerner Store. Wildman learned of Marti's interest in the store in May or June of 1981. He told her that she had to get her investment back as soon as possible and that if she worked in the store she would be fired immediately. Marti immediately tried to get her $10,000 back, but was unable to do so because the money was not available. She kept trying and Wildman also approached the other owners in an effort to get Marti's investment returned to her. Although Wildman felt that Marti's investment in the store was "wrong," he did not fire her because she was a hardworking employee, an excellent buyer ("born to be a buyer"), had three children, and was a wonderful mother. Margolis learned of Marti's interest in the store in late October of 1981 when she and Wildman were in New York at a Lerner merchandising meeting. He promptly fired Marti and demanded Wildman's resignation.

Although not pressed on appeal, defendants adduced testimony at the trial that Wildman's performance as vice-president in

charge of Puerto Rico operations left a lot to be desired.

■ Considering the evidence in the light most favorable to the plaintiff, we can only conclude that defendants' motion for judgment n.o.v. was properly denied. The jury had ample grounds for finding that Wildman was willfully discharged because of his age and the proferred reason—Marti's store investment—was only a pretext. *See McDonnell Douglas,* 411 U.S. at 804–05, 93 S.Ct. at 1825–26; *Loeb,* 600 F.2d at 1014.

### 2. *Trial on Both Federal and Puerto Rico Claims*

Defendants urge that because of the different burdens of proof the district court abused its discretion in trying the federal and Puerto Rico claims together. Under the ADEA, the burden of proof is at all times on the plaintiff. S/he must establish a prima facie case and then, if an explanation for the discharge is offered by the employer, must prove that the explanation was not the real reason for the discharge but a pretext for discrimination. *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825; *Loeb,* 600 F.2d at 1014. Under the Puerto Rico Anti-Discrimination Statute, the fact of discharge at age sixty-one would put the burden on the employer to prove that the discharge was not discriminatory. Defendants have not suggested any burden of proof problem relative to the Puerto Rico Severance Statute and we see none.

■ We find that the district court did not abuse its discretion in trying the federal and Puerto Rico claims together. The liability issue was the same under all claims: was the plaintiff discharged because of his age or his failure to fire Loida Marti when he learned of her interest in the other store. The district court carefully and correctly explained the burden of proof applicable to the statutes and written interrogatories were submitted to the jury for findings on each of the three statutes. We think that the instructions, to which there were no objections, were sufficient to enable the jury to cope with the different burdens of proof and apply them correctly. Criminal conspiracy cases with a large number of defendants and issues far more complex than those involved here are routinely submitted to juries. Moreover, if the jury found a violation of the ADEA, violations of the Puerto Rico statutes would necessarily follow. And, as already explained, there was sufficient evidence for the jury finding that defendants' discharge of plaintiff violated the ADEA.

### 3. *The Closing Argument of Plaintiff's Counsel*

■ Defendants argue that they were denied a fair trial because, in his closing argument, plaintiff's counsel misled the jury on the burden of proof and distorted the testimony. This issue is foreclosed, however, by defense counsel's failure to object at the time the allegedly improper statements were made or move for a mistrial before the verdict was returned. Counsel cannot play a waiting game and after an adverse verdict is rendered raise an objection to argument for the first time. *Computer Systems Engineering, Inc. v. Qantel Corporation,* 740 F.2d 59, 69 (1st Cir.1984); *Bryant v. Consolidated Rail Corporation,* 672 F.2d 217, 218 (1st Cir. 1982); *DeVasto v. Faherty,* 658 F.2d at 864; *American Universal Insurance Co. v. Falzone,* 644 F.2d 65, 67 (1st Cir.1981).

The argument clearly was not such that a new trial is required to prevent a miscarriage of justice despite lack of objection at trial. *See* Fed.R.Civ.P. 61; *Computer Systems Engineering, Inc. v. Qantel Corp.,* 740 F.2d at 69. In fact, the argument does not appear to us to exceed the limits of permissible aggressive advocacy.

### 4. *The Attorney's Fees Award*

After a hearing at which evidence was introduced pertaining to the fee charges of attorneys in San Juan with comparable experience and skill to that of the attorneys for the plaintiff, the district court determined the amount of fees. It found that Attorney Nachman's time expenditure of

377 hours was reasonable and his charge of $150 per hour reflected the fee charges of lawyers of similar experience and skill in San Juan. The court, therefore, awarded Nachman a fee of $56,500 based on time spent multiplied by his hourly rate.[1] The court also approved fees for Attorney Moreda, a lawyer for plaintiff not professionally associated with Nachman's firm, at the rate of $100 per hour for 141 hours, for a total of $14,100. The court then increased each of the time charge fees by 50% so that Nachman was awarded $84,862 and Moreda received $21,150.

We have no difficulty finding that in determining the basic fees the district court met the standards laid down by the Supreme Court in *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), and *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). It determined that the number of hours spent on the case was reasonable and multiplied that by a reasonable hourly rate. Plaintiff's counsel submitted evidence in the form of contemporaneous time records supporting the hours worked and testimony as to the prevailing market rate for fees in the relevant community. *Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939. *Blum,* 465 U.S. at ——–——, 104 S.Ct. at 1544–47. Defendants argue to us, as they did to the district court, that Attorney Moreda's fees were unnecessary and duplicative work. In light of the district court's permissible finding to the contrary, this argument must be rejected. We also note that the record refutes defendants' assertion in their brief that Attorney Nachman did not submit contemporaneous time records.

■ The 50% upward adjustment, however, gives us pause. The district court increased the rate times hour figure (the lodestar) by 50% because

in this particular action the attorneys for the plaintiff faced and overcame difficulties above and beyond the normal prosecution of an action. The law in this area

is still in its formative stages. Counsel displayed an acute understanding of the law. The plaintiff's attorneys also faced a contingency of losing all their time and effort. The ability of defendants' counsel and the competency with which they represented their clients, required even more than the average performance on the part of plaintiff's attorneys.

Leaving aside for the moment, the contingency fee factor, we do not think that under *Blum* either the court's reasons or the trial record justified a multiplier based on the difficulties of the action or the novelty of issues. In *Blum,* decided after the district court's decision, the Supreme Court held that "[n]either complexity nor novelty of the issues ... is an appropriate factor in determining whether to increase the basic fee award." At ——, 104 S.Ct. at 1549. The Court reasoned that whatever work was required by the issues would be fully reflected in the number of billable hours recorded and that "quality of representation" is generally reflected in the reasonable hourly rate. *Id.* The Court did recognize, however, that an upward adjustment based on the performance of the lawyer(s) may be justified, but "only in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was 'exceptional.'" *Id. See also Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939. In *Garrity v. Sununu,* 752 F.2d 727, 739 (1st Cir. 1984), we noted that upward adjustments for quality of representation after *Blum* "are to be few and far between." The case here hinged on whether the jury believed plaintiff or the person who discharged him, Karl Margolis. We do not doubt that Attorney Nachman's skill and experience, especially his cross-examination of Margolis, had a lot to do with the verdict in favor of plaintiff. Skill and experience as a litigator

---

**1.** There were lesser charges for two of Nachman's associates factored into the total fee, but

this was *de minimis.*

are, however, Nachman's stock-in-trade and he was paid his asking price.

We now turn to the question of whether a multiplier can be justified solely because of the contingent nature of the action. In *Blum* the attorney was not working on a contingency basis and the majority opinion, while noting the contingency issue, explicitly did not decide the propriety of adjusting the lodestar figure upward to encourage attorneys to take cases that involve a risk of nonpayment.[2] Writing a separate concurrence, Justice Brennan, with whom Justice Marshall joined, stressed that the statutory history of § 1988 indicated that the risk of not recovering any fee is a proper basis on which a district court may award an upward adjustment to an otherwise compensatory fee. 465 U.S. at ——, 104 S.Ct. at 1550.

A canvass of the post-*Blum* cases shows a difference of opinion among the circuits as to whether there can be an upward adjustment of the hourly rate fee because of contingent-fee risk factors. Four of the six circuits that have considered the question have held that there can be such an increase. The Ninth Circuit in *LaDuke v. Nelson*, 762 F.2d 1318 (9th Cir.1985), upheld the district court's reliance on Justice Brennan's concurring opinion in *Blum* for applying a 20% multiplier. In *Delaware Valley Citizens' Council for Clean Air v. Pennsylvania*, 762 F.2d 272 (3d Cir.1985), the Third Circuit found that the use of multipliers met the *Blum* standards, and also found that the contingent nature of the fee supported an upward adjustment where the contingency risk had been identified by plaintiff's counsel. *See also Hall v. Borough of Roselle*, 747 F.2d 838, 842–43 (3d Cir.1984) (contingency fee factor approved but not applied because case was settled prior to trial). The Eighth Circuit has held that a multiplier of 30% met the *Blum* test due to the contingent nature of

the success, the public importance of the result, and the novelty and difficulty of the issues. *Sierra Club v. Clark*, 755 F.2d 608, 620 (8th Cir.1985). The rule in the Eleventh Circuit is that: "[a] contingency fee arrangement may justify an increase in an award of attorney's fees." *Jones v. Central Soya Company, Inc.*, 748 F.2d 586, 591 (11th Cir.1984). The question in *Jones* was whether the results constituted "exceptional success" under *Blum* and *Hensley*. Finding that the case was not taken on a contingency fee basis, the court held that the district court did not abuse its discretion in denying a multiplier.

In *McKinnon v. City of Berwyn*, 750 F.2d 1383, 1392 (7th Cir.1984), the Seventh Circuit noted that *Blum* left open the question of whether the risk of losing is a permissible factor in judging "exceptional success" and applied its own rule that the risk of losing alone does not justify a multiplier. The D.C. Circuit holds that the contingency fee factor does not normally justify an upward adjustment; it is permissible only in an exceptional case. *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4, 28–29 (D.C.Cir.1984); *Murray v. Weinberger*, 741 F.2d 1423, 1427–29, 1431 (D.C.Cir.1984).

This circuit has not addressed post-*Blum* the issue of an upward adjustment in attorney's fees based on the risk of nonpayment. In a pre-*Blum* case, we held that the contingent nature of the fee was one of the factors to be considered in an upward or downward adjustment. *Furtado v. Bishop*, 635 F.2d 915, 920. (1st Cir.1980).

Section 1988 empowers the court to award a reasonable attorney's fee to the prevailing civil rights litigant. The Act does not specifically delineate how a figure constituting "reasonable attorney's fees" in a given case is to be derived. Turning to the legislative history for guidance for the appropriate standards governing fee

---

**2.** The Court stated:

Nowhere in the affidavits submitted in support of respondents' fee request, nor in their brief to the District Court, did respondents identify any risks associated with the litigation or claim that the risk of nonpayment

required an upward adjustment to provide a reasonable fee. On this record, therefore, any upward adjustment for the contingent nature of the litigation was unjustified.

*Blum*, 465 U.S. at ——, 104 S.Ct. at 1550.

awards, we note approving reference to the standards applied in several cases including, in particular, *Johnson v. Georgia Highway Express,* 488 F.2d 714 (5th Cir. 1974). In *Johnson,* one of the considerations in fixing a reasonable fee was "[w]hether the fee is fixed or contingent." 488 F.2d at 718. Another case specifically cited with approval in the legislative history is *Stanford Daily v. Zurcher,* 64 F.R.D. 680 (N.D.Cal.1974), *aff'd,* 550 F.2d 464 (9th Cir.1977), *rev'd on other grounds,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed. 525 (1978), S.Rep. 1011, 94th Cong. 2d Sess. 5, *reprinted in* 1976 U.S.Code Cong. & Ad.News 5908, 5913 (1976). In *Stanford Daily,* the district court held that it could increase the lodestar fee to reflect the fact that the attorneys' compensation was, at least in part, contingent upon their client prevailing.[3]

In determining whether to adjust the lodestar figure upward for contingent-fee risk courts have considered a number of factors including: the uncertainty of the plaintiff's or class members' ability to prove liability and damages; the court's prior decision either in favor of or against the theories put forth in the case; whether or not the government has taken any action against the defendants; the length of time and number of hours the case consumed before resolution; any public interest incentive that may be warranted; whether other attorneys have refused to take the case; the degree to which the attorney was precluded from taking other work; and the degree to which the attorney assumed a personal risk of nonpayment for services and/or nonreimbursement for expenses incurred on behalf of the plaintiff. *See Reed v. Rhodes,* 691 F.2d 266, 268 (6th Cir.1982); *White v. City of Richmond,* 559 F.Supp. 127, 133 (N.D.Cal.1982), *aff'd,* 713 F.2d 458

(9th Cir.1983); *Strama v. Peterson,* 541 F.Supp. 75, 77 (N.D.Ill.1982); *Vecchione v. Wohlgemuth,* 481 F.Supp. 776, 794 (E.D. Pa.1979). *Cf. City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 470–71 (2d Cir.1974); *Brown v. Gillette,* 536 F.Supp. 113, 123 (D.Mass.1982); *Van Gemert v. Boeing,* 516 F.Supp. 412, 418–19 (S.D.N.Y.1981); *HEW v. Tandy Corp.,* 480 F.Supp. 758, 763 (D.Mass.1979) (antitrust and security cases).[4]

While the lodestar calculation may reflect the difficulty of the resolution of the issues involved in a case, as the Court indicated in *Blum* and *Hensley,* the lodestar figure alone does not differentiate between the case taken on a full retainer and a case in which an attorney spends many hours over a period of months or years with no assurance of any pay if the suit is unsuccessful. Even if the client ultimately prevails, the burden of supporting salaried employees and fixed costs during the course of the contingent litigation can be substantial.

In addition to the risk of not recovering fees from the adverse party, the contingent-fee attorney may incur substantial expenses in the preparation and litigation of the action for everything from travel and transcript expenses to expert witness fees. Moreover, the attorney may face a second risk once his client has prevailed—that the court will find some of his time duplicative, unnecessary, or inefficiently expended.

Section 1988 was enacted in order to enable plaintiffs to secure civil rights guaranteed to them under federal law and the Constitution. We think it clear that Congress did not intend that the enforcement of civil rights be limited primarily to those able to pay an attorney a full retainer or attract one of the few pro bono legal ser-

---

**3.** In *Stanford Daily v. Zurcher,* 64 F.R.D. 680, 686 (N.D.Cal.1974), *aff'd,* 550 F.2d 464 (9th Cir. 1977), *rev'd on other grounds,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978), the plaintiffs' attorneys had been guaranteed payment by their clients for some of the 750 plus hours which they worked. Stanford Daily had agreed to pay $5,000 plus whatever funds they could raise

from interested third parties which ultimately amounted to $8,500.

**4.** The First Circuit has specifically held that civil rights cases are to be treated the same as complex federal litigation (*i.e.,* antitrust and securities). *See King v. Greenblatt,* 560 F.2d 1024, 1026 (1st Cir.1977); *Kennelly v. Lemoi,* 529 F.Supp. 140, 142 (D.R.I.1981).

vice organizations to their cause. *See* S.Rep. No. 1011, *reprinted in* 1976 U.S. Code Cong. & Ad.News at 5911–14. *See also Palmigiano v. Garrahy,* 616 F.2d 598, 602 (1st Cir.), *cert. denied,* 449 U.S. 839, 101 S.Ct. 115, 66 L.Ed.2d 45 (1980). To deny all consideration of the added burden and additional risks an attorney under a contingent fee agreement may have to bear does not strike us as "reasonable."

We disagree with the holding of the Seventh Circuit in *McKinnon v. City of Berwyn,* 750 F.2d 1383, that the risk of losing does not justify a multiplier. In *McKinnon,* the court held that a risk bonus was inappropriate because

> it compensates attorneys, indirectly but effectively, for bringing unsuccessful civil rights suits, even though the attorney's fee statute is expressly limited to cases where the party seeking the fee prevails.

*Id.* at 1392. According to the *McKinnon* court, the logic of a risk adjustment leads to a multiplier that compensates an attorney for the cases he loses as well as wins, *i.e.,* a lawyer with a one out of fifty chance of winning would get a multiplier of fifty to compensate him for the forty-nine similar cases he lost. We think such an analysis fails to consider the variables that may contribute to a lawyer's risk of loss as well as the relatively conservative multipliers that have been awarded by courts.

Despite the *McKinnon* spectre of bonus multipliers amounting to fifty times the lodestar figure bringing huge windfalls, no multipliers approaching this have ever been awarded in any § 1988 petition, or in any other attorney fee award case. In fact, the cases in which multiples of two have been awarded are unusual, even in complex litigation. *See* 6 Class Action Reports 82 (1980). While multiples of 2, 3, 4, and 4.5 have occasionally been given, these multipliers occur primarily in protracted multidistrict antitrust and securities cases involving recoveries of ten million dollars or more. *See General Public Utilities Securities Litigation,* Fed.Sec.Rptr. (CCH) 99,-566, 97,233 (D.N.J.1983) (where application

of federal securities laws to nuclear energy raised novel and substantially untested issues, 20–24 million dollars was recovered and case imposed substantial professional burdens, 3.45 multiplier justified); *Valente v. Pepsi Co., Inc.,* Fed.Sec.Rptr. (CCH) 96,-921, 95,826–63 (D.Del.1979) (2.1 multiplier awarded where litigation lasted over six years, counsel prevailed on two unsettled issues, high quality of representation, and magnitude of benefit impressive). In the area of civil rights litigation where upward adjustments are much more modest, a survey of the reported cases shows that a multiplier of two has been given only three times in the last five years. *See Ruiz v. Estelle,* 553 F.Supp. 567 (S.D.Texas 1982); *Vecchione v. Wohlgemuth,* 481 F.Supp. 776; *Aumiller v. University of Delaware,* 455 F.Supp. 676 (D.Del.1978), *aff'd,* 594 F.2d 854 (3d Cir.1979). A multiplier of more than two has not been used at all.

■ Rather than compensating the lawyers for unsuccessful claims, we believe that adjustment of the lodestar figure, after examining the particular risks assumed by an attorney in a particular case, may be necessary in order to provide the "reasonable attorney fee" envisioned by Congress under § 1988. *See Blum v. Stetson,* 465 U.S. at ——, 104 S.Ct. at 1550 (Brennan, J., concurring); *Hall v. Borough of Roselle,* 747 F.2d at 843. Of course, it is the actual risks or burdens that are borne by the lawyer or lawyers that determine whether an upward adjustment is called for, not the mere fact that the case was taken on a contingent basis.

■ In the case before us, the district court held, without elaboration, that the contingent nature of the case as well as Nachman's performance moved him to award a 50% multiplier. Since we have found that this was not a case resulting in exceptional success within the requirement of *Blum,* we must remand for a redetermination of what multiplier, if any, based solely on the contingent nature of the case is appropriate. In making its decision, the district court should examine the risks un-

dertaken by each attorney separately and consider:

1. what, if any, payment each attorney would have received had the suit not been successful;

2. what, if any, costs or expenses each attorney would have incurred if the case had been lost;

3. whether, after the successful verdict, Nachman and Moreno were completely dependent upon the court for their fees;

4. the length of time and number of hours the case consumed during which Nachman was required to compensate his associates and carry his overhead expenses without assurance of compensation; and

5. whether other attorneys refused to take the case because of a risk of nonpayment.

The district court may, of course, consider other contingent-fee factors it deems relevant.

## II

Plaintiff's appeal raises two issues: whether future loss of earnings, "front pay," should have been awarded under the ADEA; and whether plaintiff was entitled to damages for emotional suffering and loss of future earnings to age sixty-five under the Puerto Rico Anti-Discrimination Statute, 29 P.R.Laws Ann. tit. 29, § 146.

### 1. *Front Pay*

Just prior to the start of the trial, the district court entered an opinion and order "containing all rulings as to the interpretation of the laws which are applicable." 582 F.Supp. 80. One of the rulings eliminated plaintiff's claim for future damages. Relying on our decision in *Loeb*, 600 F.2d 1003, and *Kolb v. Goldring, Inc.*, 694 F.2d 869 (1st Cir.1982), and an analysis of the ADEA, the court ruled that "given the age of the plaintiff, it would be speculative to estimate future earnings after judgment and it would be mere guesswork to try. Under these circumstances, we refuse to believe that Congress intended to award damages after date of judgment. We must

conclude that damages have a cutoff date as of the time of judgment."

This circuit has never ruled squarely on the question of whether future loss of earnings may be awarded as part of a plaintiff's damages under the ADEA. But, as the district court noted, we used language from which it could be inferred that such damages would probably not be approved. We pointed out that the Supreme Court

has never been confronted with the issue of damages in lieu of reinstatement and, undoubtedly because of the difficulty of ascertaining future damages, there does not appear to be significant authority for such awards by "equity courts," except perhaps in cases involving the breach of employment contracts of specified duration.

*Loeb*, 600 F.2d at 1023, and in a footnote we stated:

We do not necessarily equate damages in lieu of reinstatement with liquidated damages, which are intended to cover damages that are difficult to ascertain. Nevertheless, where the value of reinstatement is highly speculative, the availability of a substantial liquidated damages award under the ADEA may be a proper consideration in denying additional damages in lieu of reinstatement.

*Id.* at n. 35. Our holding, however, swallowed the bullet for another day, instead of biting it:

Assuming, without in any way deciding, that a monetary award may be made in lieu of reinstatement, we suspect that both continuing payments and substantial awards calculated, for example, on the basis of life expectancy would be inappropriate. For the time being, however, we leave all of these questions open for initial consideration by the district court, if they surface again after a new trial.

*Id.*

In *Kolb v. Goldring, Inc.*, we held that a jury's determination of compensatory damages was excessive because of lack of evi-

dence. In a footnote we stated that the proper period for a damage award where plaintiff does not seek reinstatement is from the date of termination to the date of judgment "and the plaintiff cannot then recover damages for future economic loss, or 'front pay,' even though the injury continues." 694 F.2d at 874 n. 4 (citing to *Wehr v. Burroughs Corporation*, 619 F.2d 276, 283 (3d Cir.1980)).

We think the time has come to make a definitive ruling on "front pay" under the ADEA. The first step is a survey of the holdings in the other circuits. In a comprehensive decision that explored carefully the holdings of other circuits, the Second Circuit held:

> In sum, we think that front pay is, in limited circumstances, an appropriate remedy under the ADEA. It serves a necessary role in making victims of discrimination whole in cases where the factfinder can reasonably predict that the plaintiff has no reasonable prospect of obtaining comparable alternative employment.

*Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 729 (2d Cir.1984). Two things must be pointed out: first, unlike the case at bar, the district court found that defendant did not "willfully" violate the statute and, hence, there was no doubling of the compensatory damage award, *see* 29 U.S.C. § 626(b); and, as in the case at bar, the district court found that reinstatement was not feasible.

In a Title VII sex discrimination case, the Third Circuit held that "[a] front pay award is discretionary with the trial court. It differs from a back pay allowance because it necessarily implicates a prediction about the future. *See Loeb v. Textron, Inc.*, 600 F.2d 1003 (1st Cir.1979) (ADEA)." *Dillon v. Coles*, 746 F.2d 998, 1006 (3d Cir.1984) (citation omitted). In a prior ADEA case already adverted to in a footnote in *Kolb*, 694 F.2d 869, the Third Circuit held that the plaintiff removed the issue of future damages from consideration by specifically disclaiming any desire for reinstatement and concluded "that the question whether

future damages may be recovered in ADEA cases is not properly before us at this time." *Wehr v. Burroughs Corp.*, 619 F.2d at 283–84 (footnote omitted).

After discussing cases in the other circuits, including *Loeb v. Textron, Inc.* and *Kolb v. Goldring, Inc.*, the Sixth Circuit concluded that " 'Front pay' does not appear to lend itself to a per se rule," and, "is but one of a broad range of remedial measures available under the ADEA." It held that an award of front pay must be left to "the discretion of the trial court under the facts and circumstances of the individual case." *Davis v. Combustion Engineering, Inc.*, 742 F.2d 916, 922–23 (6th Cir.1984).

The Sixth Circuit relied heavily on the Eighth Circuit case of *Gibson v. Mohawk Rubber Company*, 695 F.2d 1093 (8th Cir. 1982), in which that court held: "The equitable relief that the district court may grant, includes, *inter alia*, additional pension benefits, reinstatement, and monetary damages in lieu of reinstatement." *Id.* at 1100. One of the cases cited as support for this holding was *Loeb v. Textron.*

The Ninth Circuit also relied on *Loeb v. Textron* in holding:

> Damages in lieu of reinstatement may be awarded in addition to liquidated damages. However, the value of reinstatement is often speculative. Thus, availability of a substantial liquidated damages award may be a proper consideration in denying additional damages in lieu of reinstatement. *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1021–23 (1st Cir.1979).

*Cancellier v. Federated Department Stores*, 672 F.2d 1312, 1319 (9th Cir.) (footnote omitted), *cert. denied*, 459 U.S. 859, 103 S.Ct. 131, 74 L.Ed.2d 113 (1982).

In a very recent decision, the Tenth Circuit considered the "front pay" question carefully and held that where reinstatement is impossible as a practical matter an award of future damages in lieu of reinstatement furthers the purpose of the ADEA by assuring that the plaintiff is returned as nearly as possible to the economic situation s/he would have enjoyed but for the illegal discharge. *Equal Em-*

*ployment Opportunity Commission v. Prudential Federal Savings and Loan Association,* 763 F.2d 1166 (10th Cir.1985).

So also, the Eleventh Circuit has approved front pay where reinstatement would be impracticable or inadequate. *Goldstein v. Manhattan Industries, Inc.,* 758 F.2d 1435, 1448–49 (11th Cir.1985).

In a Title VII case, the D.C. Circuit held that front pay may be used "to make plaintiffs whole for the losses caused by discrimination." *Thompson v. Sawyer,* 678 F.2d 257, 292 (D.C.Cir.1982).

It is important to point that in discussing front pay under the ADEA all courts have stressed the broad remedial power given the court under 29 U.S.C. § 626(b):

> In any action brought to enforce this chapter the court shall have jurisdiction to grant such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter, including without limitation judgments compelling employment, reinstatement or promotion, or enforcing the liability for amounts deemed to be unpaid minimum wages or unpaid overtime compensation under this section.

■ Based on our survey of the other circuits and the factors we delineated in *Loeb,* 600 F.2d 1003, we adopt the following front pay rule. Future damages should not be awarded unless reinstatement is impracticable or impossible; the district court, then, has discretion to award front pay. Because future damages are often speculative, the district court, in exercising its discretion, should consider the circumstances of the case, including the availability of liquidated damages.

■ Although the district court, here, ruled as a matter of law in its pretrial order that future damages could not be awarded under the ADEA, it also exercised its discretion after the verdict was rendered in denying future damages. It found that, under the circumstances, reinstatement would be impracticable and stated: "Plaintiff has been made whole and the plaintiff's motion for equitable relief in the

nature of reinstatement is denied." We interpret this to mean that the monetary damages stipulated to by the parties adequately reimbursed plaintiff for his illegal discharge. An examination of the components of the damage award substantiates this: In addition to compensatory damages, the plaintiff received liquidated damages under 29 U.S.C. § 626(b) in the same amount; he also received double damages under the Puerto Rico Anti-Discrimination Statute and additional damages under the Puerto Rico Severance Pay Statute. Plaintiff's total judgment, excluding costs, came to $348,518. The district court met the requirements of our rule, albeit unknowingly. We affirm its finding that future damages were, under the circumstances of this case, unnecessary.

2. *Damages for Emotional Suffering and Loss of Future Earnings Until Age Sixty-Five Under Puerto Rico Law*

In the same pretrial order dealing with front pay, the district court also ruled that future wages to age sixty-five and damages for emotional suffering were not available under the Puerto Rico Anti-Discrimination Statute, 29 P.R.Laws Ann. tit. 29, § 146. We agree with the district court that because the statute specifies the remedies available, it would distort its meaning and purpose to engraft onto it the general rule of damages for torts in Puerto Rico. We adopt the opinion of the district court on this issue and rule that the Puerto Rico Anti-Discrimination Statute is self-contained and does not authorize damages for emotional suffering and loss of future earnings.

*Remanded for a determination of what, if any, multiplier should be used; affirmed in all other respects.*

No costs on defendants' appeal; costs awarded to defendants on cross-appeal.

### ORDER OF COURT
Petition for rehearing denied.

Although we may have misstated the elements of the damages, it was the amount that prompted the district court's finding that the plaintiff had been made whole. We see no reason, therefore, to modify our ruling on "front pay."

On remand, the district court shall reconsider its ruling front pay and damages for emotional suffering are not available under Puerto Rico law in the light of *Odriozola v. Superior Cosmetic Distributors Corporation,* No. R–83–144 (Supreme Court of Puerto Rico, June 28, 1985).