Manuel **MALDONADO–MALDONADO,**
Plaintiff,

v.

**PANTASIA MANUFACTURING
CORPORATION,**
Defendant.

**Civil No. 92–1609(DRD).**

United States District Court,
D. Puerto Rico.

Sept. 30, 1997.

Enrique J. Mendoza–Mendez, Mendoza & Baco, San Juan, PR for plaintiff.

Graciela J. Belaval–Bruno, Martinez, Odell & Calabria, Hato Rey, PR, for defendant.

## OPINION AND ORDER

DOMINGUEZ, District Judge.

On May 6, 1992, Mr. Manuel Maldonado filed a civil action against his former employer, Pantasia Manufacturing Corp., for alleged violations of the Age Discrimination in Employment Act of 1967 ("ADEA"), § 2 *et seq.*, as amended, 29 U.S.C. § 621 *et seq.* and Puerto Rico Law 100 of June 30, 1959 (P.R. Laws Ann. tit. 29 § 146 *et seq.*) and Law 80 of May 30, 1976 (P.R. Laws Ann. tit. 29 § 185).

Mr. Maldonado prevailed under the summary judgment standard by producing sworn statements which created controversy on genuine issues of fact as to whether age animus was demonstrated by Pantasia, whether Mr. Maldonado was qualified or not, and as to whether he was substituted by a younger employee or not. *See* Opinion & Order, Docket No. 28. During pre-trial procedures Mr. Maldonado moved to waive trial

by jury, Pantasia and the Court acquiesced. *See* Docket Nos. 39 and 40. The case was set to be bench trial beginning on August 26, 1997.

The case was called to be heard on August 26, 1997. In support of his case, Mr. Maldonado offered his own testimony, and that of former employees Juanita Rivera, and Divina Díaz Cintrón and the expert testimony of psychologist Urbano Cuesta Hernandez. Mr. Maldonado also offered the documentary evidence previously submitted with his opposition to motion for summary judgment. Pantasia offered in evidence the material facts uncontested at summary judgment by Mr. Maldonado, and other documentary evidence all of which was unopposed by Plaintiff.

The court, having considered the uncontested material facts and stipulations, heard the testimony of the witnesses, and observed their demeanor and having examined the evidence, makes the following findings of fact and subsequent conclusions of law.

## I. Facts of the Case

Pantasia Manufacturing Corporation (Pantasia) was a manufacturer of lingerie located in Manatí, Puerto Rico up to November 4, 1992, when the factory closed operations. The plant manufactured undergarments for brand names. Mr. Manuel Maldonado was hired on April 26, 1971, by Pantasia, as Assistant Manager, at the age of forty (40). Two years later, in 1973, Mr. Maldonado was named General Manager. He was terminated at the age of sixty (60) on March 28, 1991.

The company was originally owned by two brothers, Marvin and Irwin Greenwald. By 1986, the profits from Pantasia had dipped perilously low, with a return on investment of 1.5%. *See infra* note 6. Until 1987, Mr. Maldonado reported directly to Irwin Greenwald, who purchased the fabrics, but had no manufacturing experience, and relied on Mr. Maldonado for manufacturing decisions. That year, Irwin Greenwald retired, and sold his interest in the company to his brother and partner, Marvin Greenwald. Mr. Marvin Greenwald was sixty–one at the time he terminated Mr. Maldonado.

Up to 1987, Mr. Maldonado ran the manufacturing operations practically by himself, with a floor lady, Francisca Muñiz, in charge both of production and quality control, and a series of line supervisors reporting to her. These supervisors were hourly paid. Mr. Maldonado also had a cutting room supervisor, Victor Otero, and a warehouse supervisor reporting directly to him.

In 1987, Marvin Greenwald hired Jack Handler to oversee the Pantasia operations. By 1988, income from operations had dipped even lower, to 0.9%. Ex. H. Thereafter, in May, 1988, Mr. Handler gradually began to take powers away from Mr. Maldonado. Mr. Handler hired Mr. José Torres, age 58 at the time of hire, as Production Manager.

Mr. Torres reported to work in June 1988. He had to learn the procedures followed by Mr. Maldonado by observing the operations. According to Mr. Maldonado, he had been a friend of Mr. Torres, notwithstanding their working relationship gradually deteriorated. Mr. Maldonado would disauthorize Mr. Torres, and revert the operational changes instituted by Mr. Torres to Mr. Maldonado's old systems. Mr. Maldonado recommended that Mr. Torres be fired, however the recommendation was not followed by the owner.

Mr. Maldonado was not the only Pantasia employee who disapproved of Mr. Torres. Pursuant to the testimony of former employee Divina Díaz Cintrón, the relationship was poor with plant personnel because Mr. Torres arrived at Pantasia with a bad attitude. He repeatedly addressed all the Pantasia employees, (about 300) telling them that the employees who had been working there for a long time showed bad habits and he threatened to dismiss them. When addressing the full complement of employees, Mr. Torres also stated that the employees had been spoiled by Mr. Maldonado, and he was going to get rid of all the old personnel (long–tenured) and recruit and train new employees. However, Mr. Torres addressed these statements to all employees, regardless of their age. There were twenty-year old, thirty-year old, forty-year old, in the employee complement that Mr. Torres addressed.[1]

---

1. Questions made by the presiding Judge.

A few months after Mr. Torres began working at the Manatí plant, Saul Gold, 58 years old at the time, was hired to evaluate the Pantasia operations. Mr. Gold then held an industrial engineering degree from the University of Maryland and had been involved in the needle industry for more than forty (40) years.

According to Mr. Maldonado, Mr. Gold, who was older than Mr. Maldonado, evaluated the Pantasia operations and began hiring new personnel leaving Mr. Maldonado "aside". Mr. Gold changed all the procedures established by Mr. Maldonado, stating to him that the new procedure was a more efficient, and asking Mr. Maldonado to follow the newly instituted procedure. Mr. Gold supported Mr. Torres in the management of the production floor.

The major deficiencies found by Mr. Gold were: the factory was disorderly and unkempt; thousands of boxes of incomplete repairs lined the walls; lack of adequate record keeping, the records prepared concealed the "make up paid" ("make up" is the amount of money that must be paid per hour to an operator that does not meet his or her piece rate), poor and unscientific costing of new models and inadequate quality control supervision. Nonetheless, Mr. Gold wrote a very kind reassuring note to Mr. Maldonado in December, 1988, telling him, in essence, that it was a pleasure working with such a knowledgeable, professional person. Income from operations had decreased from $964,700 (13%) in 1983 to $78,563 (0.9%) in 1988.[2] *See* Ex. H.

Based on his findings, Mr. Gold recommended that the accountant be substituted, and an experienced industrial engineer and a quality control supervisor be hired. These recommendations were approved, and as a result, Mr. Robert Molina was hired as Comptroller. Mr. Gold also hired Mr. Héctor Rodríguez and an assistant as Industrial Engineers, and upon the retirement of the Floor Lady, Mr. Gold hired Ms. Benigna Feliciano, an experienced Quality Control Manager in her mid 40's.[3]

Mr. Maldonado alleges that prior to his discharge, his functions as General Manager were reassigned to Mr. Saul Gold, Vicepresident of Manufacturing, Mr. Joe Torres, Production Manager, Mr. Héctor Rodríguez, Industrial Engineer, and Mr. Robert Molina, CPA and Comptroller, all hired in 1988. Of these new managerial employees, only the Comptroller, Mr. Molina, and the engineers, Mr. Héctor Rodríguez and his assistant, Ms. Nancy Rivera, were under the age of forty. As to the duties of Mr. Molina, Mr. Maldonado recognized that he lacked education of an accountant and was not qualified to perform the work performed by Mr. Molina, who worked primarily in computerized inventory control. Similarly, Mr. Maldonado lacked the academic qualifications of Mr. Rodríguez, and Ms. Rivera who were industrial engineers.

It is uncontroverted that because of substantially higher labor costs, Puerto Rico was at a competitive disadvantage with the Dominican Republic, Mexico, or Taiwan. To be able to compete in the manufacture of undergarments for brand companies, costing was essential, and the clients' scheduling demands had to be met. Thus, the operations in Puerto Rico had to be specially efficient. Further as acknowledged by plaintiff at trial, products that are incomplete are not sellable and, therefore, the direct labor cost incurred and material used in the production of an incomplete style meant a loss for the company, which could not market the incomplete garments and lost the production costs thereof.

Beginning on 1987, Mr. Maldonado received several memos from Mr. Handler and the Greenwalds, bringing to his attention serious deficiencies in his performance, most specifically, improper costing of the garments produced, styles that were placed in production and could not be located, and most critical, styles which had been placed into production in spite of the fact that the material components were not complete.

---

**2.** Income on operation at 1987 had considerably decreased to $145,689 (1.9%). *See infra* note 6.

**3.** The facts as to deficiencies found and hirings by Mr. Gold remained uncontroverted at the summary judgment level.

By the end of 1990, the only function being performed by Mr. Maldonado was that of cutting room supervisor, and notwithstanding his displeasure as to loss of managerial functions, he remained with the General Manager title and pay. The duties of Cutting Room Supervisor had been performed previously by Evelyn Cruz, a long time supervisor of the crotch sewing operation at a salary of $175.00 to 200.00 a week, paid on an hourly basis. Ms. Cruz was relocated to the crotch operation freeing the cutting room duties for Mr. Maldonado.

The economic situation of the company continued to border on break-even at the end of 1990 (income from operations at only $44,-163 (0.4%)). In early 1991, Pantasia offered Mr. Maldonado a separation package. (Mr. Maldonado had prior thereto cashed in his pension plan in 1987, when Irwin Greenwald retired.) Mr. Maldonado negotiated vigorously, and finally rejected the separation package offered.

When no agreement was reached as to separation pay, Mr. Maldonado was terminated and informed that the reason for his separation of employment were economic. Thereafter, in response to the queries of the Unemployment Division of the Puerto Rico Department of Labor, Pantasia stated the reason for unemployment as performance problems. Upon Mr. Maldonado's termination, Mr. Quiterio Cruz, a cutting room employee for the prior two and a half years, was named Cutting Room Supervisor.

## II. Conclusions of Law

In a wrongful termination case under the ADEA, the Plaintiff must establish "that his years were the determinative factor in his discharge. That is, that he would not have been fired but for his age." *Ivan Ruiz, et al. v. Posadas de San Juan Associates*, 124 F.3d 243 (1st Cir.1997); *Manuel T. Hidalgo v. Overseas Condado Insurance Agencies Inc.*, 120 F.3d 328 (1st Cir.1997); *Serrano–Cruz, et al. v. DFI Puerto Rico, Inc.*, 109 F.3d 23 (1st Cir.1997); *Greenberg v. Union Camp Corp.*, 48 F.3d 22, 26 (1st Cir.1995); *Mesnick v. General Elec. Co.*, 950 F.2d 816, 823 (1st

Cir.1991) (quoting *Freeman v. Package Mach. Co.*, 865 F.2d 1331, 1335 (1st Cir. 1988)), cert. denied, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992); see also *Vega v. Kodak Caribbean, Ltd.*, 3 F.3d 476, 478 (1st Cir.1993).

Mr. Maldonado contends that the reassignment in 1988 of the duties he had performed as general manager to several new employees, and his eventual termination in 1991, were due to age bias. Mr. Maldonado's claims of discriminatory reassignment of duties are untimely. Mr. Maldonado knew, at least since late 1988, of the negative employment actions taken by Pantasia (reduction in his managerial status).

It is well settled that the statutory period for the filing of civil rights claims begins on the date the alleged unlawful employment practice occurred or when the same is known by the affected employee. *Delaware State College, et al. v. Ricks*, 449 U.S. 250, at 256, 257, 101 S.Ct. 498, at 503, 503–04, 66 L.Ed.2d 431, at 438, 439 (1980); *Carlos Chardon v. Rafael Rivera Fernandez, et al.*, 454 U.S. 6, at 8, 102 S.Ct. 28, at 29, 70 L.Ed.2d 6, at 9 (1981). See also, *Gay v. AVCO Financial Services, Inc.*, 769 F.Supp. 51 (D.P.R.1991).

Under a deferral state scenario as is applicable in the present case, plaintiffs are required to take their claim in the first instance to the relevant state agency. *Id.* at 53. *Powers v. Grinnell Corp.*, 915 F.2d 34, 38 (1st Cir.1990). Sixty days later, if the state has not terminated its investigation sooner, plaintiff may then file with the EEOC. 29 U.S.C. § 633. The filing with the EEOC must take place within 300 days of the alleged discriminatory act. 29 U.S.C. § 626(d). The timeliness of the filing with the EEOC is a statute of limitations matter, not a jurisdictional prerequisite to suit. *Kale v. Combined Insurance Co.*, 861 F.2d 746, 752 (1st Cir. 1988). Maldonado failed to file charges of the discriminatory action by Pantasia within 300 days of the date of the action complained about, October, November, and December, 1988.[4] Therefore, his claims of discriminatory treatment expired by the end of 1989.

---

**4.** The EEOC claim on file alleges that all facts as to the shrinking of duties as General Manager occurred in 1988.

Mr. Maldonado having filed charges with the EEOC for the first time in May, 1991, any claims based on the 1988 reduction of authority, and distribution of Mr. Maldonado's duties to new employees must be dismissed.

■ Although not clearly alleged, Plaintiff Maldonado hints that the reduction in his authority was a violation of a continuing nature. The First Circuit has outlined two types of continuing violations: serial violations and systemic violations. *Sabree v. United Bro. of Carpenters and Joiners*, 921 F.2d 396, 400 (1st Cir.1990); *Jensen v. Frank*, 912 F.2d 517, 520, 522 (1st Cir.1990); *Mack v. Great Atlantic & Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir.1989). No evidence has been presented of a systemic violation,[5] therefore, the Court must focus on the alternate continuing violation. Serial violations are "composed of a number of discriminatory acts emanating from the same discriminatory animus, each act constituting a separate wrong actionable" under federal law. *Sabree*, 921 F.2d. at 400, citing *Jensen v. Frank*, 912 F.2d at 522. In order for an unlawful employment practice to be actionable, at least one act in series must fall within the limitations period. *Jensen*, 912 F.2d at 522.

All the acts described by Mr. Maldonado, other than his eventual discharge in March, 1991, occurred in late 1988. Maldonado failed to file charges of the discriminatory action by Pantasia within 300 days of the action complained about, which occurred in October, 1988. Therefore, his claim of discriminatory treatment expired by the end of 1989. Mr. Maldonado having filed charges with the EEOC for the first time in May 1991, any claims based on the 1988 reduction of authority, and distribution of Mr. Maldonado's duties to new employees must be dismissed as time barred.

## III. The Termination of Employment

Mr. Maldonado's only surviving federal cause of action is the claim of discriminatory discharge on March 28, 1991, which falls within the purview of the charge filed by Mr. Maldonado with EEOC. Thus, this Court must analyze whether plaintiff's termination on March 28, 1991 was discriminatory under ADEA and or Puerto Rico Law 100.

■ The burden of proof under the federal statute and the Puerto Rico statute on which Mr. Maldonado based his claims is entirely different. While the ultimate burden of proof rests upon the Plaintiff in an ADEA case, the ultimate burden of proof in a Law 100 case rests upon the defendant. *Wildman v. Lerner*, 771 F.2d 605, 609 (1st Cir. 1985); *Dominguez v. Eli Lilly and Company*, 958 F.Supp. 721, 741–43 (D.P.R.1997); *Rosa v. Burns & Roe Services Corp.*, 726 F.Supp. 350, 353 (D.P.R.1989). Therefore, the local legislation is more favorable to the Plaintiff than its federal counterpart. "... it is possibly conceivable that in some controversies the result may ultimately rest on which of the two statutes applies". *Ibáñez Benítez v. Molinos de Puerto Rico*, 114 D.P.R. 42, 14 Official English Translations 58, 73, 1983 WL 204221 (1983). The Court will first analyze the federal standard.

## IV. Discrimination: Age Animus

### A. Direct evidence of age discrimination

"Direct or indirect evidence of discriminatory evidence may do but 'the evidence as a whole ... must be sufficient for a reasonable factfinder to infer that the employer's decision was motivated by age animus'." *Hidalgo v. Overseas Condado*, 120 F.3d 328, 335 (1st Cir.1997), quoting *LeBlanc*, 6 F.3d at 843.

■ Maldonado contends that a series of remarks made by Mr. Torres to employees constitutes direct evidence of age discrimination. It is not always clear what is direct evidence of discrimination. *Ayala–Gerena v. Bristol Myers–Squibb Co.*, 95 F.3d 86, 95 (1st Cir.1996). Notwithstanding, the Circuit Court of Appeals for the First Circuit has defined direct evidence as " ... evidence which in and of itself shows a discriminatory animus," *Id.*, at 95, quoting *Jackson v. Harvard Univ.*, 900 F.2d 464, 467 (1st Cir.1990).

---

**5.** "A systemic violation has its roots in a discriminatory policy or practice; so long as the policy or practice itself continues into the limitation period, a challenger may be deemed to have filed a timely complaint". *Jensen*, 912 F.2d at 523.

The Court has carefully scrutinized Mr. Torres' statements and concludes that the remarks do not evince any age animus. When Mr. Torres threatened termination because of performance and attitude, he addressed young and old alike (some in their twenties and thirties), telling them that they had been spoiled, had bad working habits, and if matters did not improve, he would terminate them all (referring to them all as "old" employees) and recruit and hire new employees. These comments are not direct evidence of age discrimination.

## B. Indirect evidence of age discrimination

In the absence of direct evidence, a plaintiff may prove discriminatory evidence through the well established *McDonnell Douglas* framework. The employee must initially come forward with sufficient evidence to establish a prima facie case of discriminatory discharge. Thus, here, Mr. Maldonado had to establish that (i) he is a member of a protected class, *i.e* over forty years of age, (ii) his job performance was sufficient to meet legitimate job expectations, (iii) that he experienced adverse employment action and Pantasia did not treat age neutrally. *Serrano–Cruz*, 109 F.3d, at 25; *Goldman v. First Nat'l. Bank of Boston*, 985 F.2d 1113, 1117 (1st Cir.1993); *LeBlanc*, 6 F.3d at 842. The required prima facie showing is not specially burdensome, see *Greenberg*, 48 F.3d, at 26; *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 15 n. 4 (1st Cir.1994); *Vega*, 3 F.3d at 479; see also *Sánchez*, 37 F.3d at 719.

Once the Plaintiff has met this relatively light burden, a presumption of discrimination arises and the onus is then shifted to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Mesnick*, 950 F.2d at 823. If the employer produces such a justification, the presumption of discrimination vanishes and the burden shifts back to the Plaintiff to show that the employer's alleged justification is merely a pretext for discrimination. *Serrano–Cruz*, 109 F.3d at 25–26; *Woods v. Friction Materials, Inc.*, 30 F.3d 255, 260 (1st Cir.1994).

Plaintiff is required to do more than simply refute or cast doubt on the employers' rationale. The First Circuit has traditionally required anticipating Supreme Court precedent evidence that "is not only minimally sufficient evidence of pretext,' but that overall reasonably supports a finding of discriminatory animus." *LeBlanc*, 6 F.3d 836 at 842 (1st Cir.1993).

The Supreme Court discussed the burden of proof in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510–15, 113 S.Ct. 2742, 2749–51, 125 L.Ed.2d 407 (1993). There, the Court explained that even when defendant's proffered reason is considered pretextual and not credible, Plaintiff will always bear the ultimate burden of persuasion to establish discrimination *vel non*. *Id.*, at 517–19, 113 S.Ct. at 2753.

The evidence as a whole, whether direct or indirect, must be sufficient for a factfinder to infer that the employer's decision was motivated by age animus. *Connell*, 924 F.2d at 1172; *Gray v. New England Tel. & Tel. Co.*, 792 F.2d 251, 254 (1st Cir.1986); *Medina–Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 9 (1st Cir.1990). Mr. Maldonado had to proffer specific facts to enable the Court to find that the reason given "is not only a sham, but a sham intended to cover up the employer's real motive: age discrimination." *Mesnick v. General Electric Co.*, 950 F.2d 816, 824 (1st Cir.1991) (citing *Medina–Muñoz*, 896 F.2d at 9). The burden of persuasion, as opposed to the burden of production, rests with the Plaintiff throughout. *Serrano–Cruz*, 109 F.3d at 26.

The admissions of Mr. Maldonado clearly support the non discriminatory reasons advanced by Pantasia for Mr. Maldonado's termination. His own testimony establishes that he was not performing his job functions in a manner satisfactory to the employer. Mr. Maldonado admitted that Pantasia hired an industry expert as consultant to analyze its operations and the expert, Mr. Saul Gold, virtually changed all the procedures Mr. Maldonado had established at the plant.

Mr. Maldonado never demonstrated the Court that the articulated reason of poor performance was a sham. Further, Plain-

tiff's own documents produced initially to oppose summary judgment demonstrate that the corporation was under economic duress in that profits derived from operations were down when the Company decided to terminate Plaintiff.[6]

Most critically however, the undisputed facts further establish the absence of age bias. Mr. Maldonado was hired at the age of forty, and was discharged at the age of sixty under the administration of one of the two original owners, both older than Mr. Maldonado. Moreover, the decision maker as to all changes operated at Pantasia, and the ultimate discharge of Mr. Maldonado was Mr. Saul Gold, of sixty-two (62) years old at the time of Mr. Maldonado's termination. The other key person in the administration was José Torres, age 58, who was hired as Production Manager by the parent company.

Mr. Maldonado argues that the differing reasons given for the termination demonstrate that they were a pretext for discrimination. Mr. Maldonado's argument is not well founded. The facts in this case amply support a finding that Mr. Maldonado was terminated both for poor performance and as an economic measure.

When assessing pretext, courts focus on the perception of the decision maker (the employer) when it decided to terminate the employees and whether his perception is "credible and reasonable." *Gray v. New England Tel. & Tel. Co.*, 792 F.2d at 256. However, "[c]ourts may not sit as super personnel departments, assessing the merits or even the rationality of employers' non discriminatory decisions." *Mesnick*, 950 F.2d at 825. Furthermore, the defendant need not persuade the court that it was actually motivated by the proffered reason. The explanation provided simply must be legally sufficient to justify a judgment in its favor. *Freeman v. Package Machinery Co.*, 865 F.2d 1331, 1335 (1st Cir.1988).

In the absence of any evidence of pretext, or of age animus, the Court may not second

guess the business decisions of the employer. The First Circuit has stated repeatedly that Courts will not assume the role of a super personnel departments to assess the merits or even the rationality of non discriminatory business reasons. *Mesnick*, 950 F.2d at 825; *Connell v. Bank of Boston*, 924 F.2d at 1172; *Rossy v. Roche Products, Inc.*, 880 F.2d 621, 625 (1st Cir.1989).

The ADEA does not stop an employer from rejecting an employee "for any reason (fair or unfair) or for no reason, so long as the decision to [reject] ... does not stem from the person's age". *Mesnick v. General Electric Company*, 950 F.2d at 825. In *Gray*, 792 F.2d 251, the First Circuit explained:

> It is **not enough** for the Plaintiff to show that the employer made an unwise business decision, or an **unnecessary personnel move.** Nor is it enough to show that the employer acted arbitrarily or with **ill will.** These facts, **even if demonstrated** do not show necessarily that age was a motivating factor. *Id.* at 255 (emphasis ours.)

While ADEA protects employees from being discriminated because of their age, the Act does not require the granting of any special considerations to an employee based upon his age. *DiBiase v. SmithKline Beecham*, 48 F.3d 719, 725 (3d Cir.1995).

Recapitulating, the Court finds no evidence to justify that "the evidence as a whole ... infer[s] that the employer's decision was motivated by age animus." *Hidalgo v. Overseas Condado Insurance Agencies, Inc.*, 120 F.3d at 335 quoting from *LeBlanc*, 6 F.3d at 843.

## V. The Local Law Claims

 As to the local claim under Law 100, P.R. Laws Ann. tit. 29 § 146 *et seq.*, the court is guided by the Supreme Court cases of *Ibañez v. Molinos de Puerto Rico, Inc.*, 114 P.R. Dec. 42, 1983 WL 204221 (1983); *Narvaez v. Chase Manhattan Bank*, 120 P.R. Dec. 731, 1988 WL 580838 (1988); *Baez Gar-*

---

**6.** Exhibit H reveals the following income from operations:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1983 | $964,700 | (13.3%) | 1986 | $96,703 | (1.5%) | 1989 | $32,684 | (0.3%) |
| 1984 | $727,396 | (10.7%) | 1987 | $145,689 | (1.9%) | 1990 | $44,136 | (0.4%) |
| 1985 | $637,256 | (8.7%) | 1988 | $78,563 | (0.9%) | | | |

*cia v. Cooper Lab.,* 120 P.R. Dec. 145, 1987 WL 448243 (1987), and the interpretation of said cases made by federal courts, *DeArteaga v. Pall Ultrafine Filtration Corp.,* 862 F.2d 940, 943 (1st Cir.1988); *Menzel v. Western Auto Supply Co.,* 848 F.2d 327, 330–31 (1st Cir.1988); and *Dominguez v. Eli Lilly and Co.,* 958 F.Supp. 721, 741 (D.P.R.1997), discussing the burden shifting standard under Law 100. Generally, "[t]he employee carries the initial burden of presenting sufficient, probative evidence that she or he was discharged without 'just cause'. This burden encompasses two requirements. The employee must show that: (1) he or she was actually or constructively discharged; and (2) the discharge was without 'just cause.'" *Dominguez v. Eli Lilly* 958 F.Supp. at 741 (citations omitted). Should the employee prove no "just cause", a presumption of discrimination is established. The presumption is controvertible. P.R. Laws Ann. tit. 29 § 148. The employer must then produce evidence and persuade the court that the employer was dismissed for a non-discriminatory reason. *Ibañez,* 114 P.R. Dec. at 51–53.

 The Court harbors no doubt that the allegations as to the facts that occurred in 1988 (diminished managerial status) are time barred because the statute of limitations is one year. *Olmo v. Young & Rubicam P.R., Inc.,* 110 P.R. Dec. 740, 1981 WL 176523 (1981). Plaintiff did not produce any evidence that there was an interruption made until the filing of the charges at the EEOC in May 1991. By then, the 1988 cause of action had expired. Even if the cause of action as to undermining of plaintiff's managerial status was not time barred, the court finds that the employer proved "just cause" by preponderance of credible evidence that the termination was due to the ineffective performance of plaintiff. *DeArteaga v. Pall Ultrafine,* 862 F.2d at 941–43.

As to the termination of plaintiff in 1991, the Court similarly finds that there was just cause for termination-the employers' precarious economic situation "reductions in the volume of ... profits" P.R. Laws Ann.

tit. 29 § 185(b)(f).[7] The dwindling profits of the company at a depressed point of $44,163 in 1990 compared to $964,700 in 1983, justify the company to perform a savings cost in the compensation of plaintiff valued at $65,000 pursuant to paragraph nine (9) of the complaint.

Even if for some technical reason defendant not have proved "just cause" under the local law defendant can still prove a non-discriminatory reason. *Ibañez,* 114 P.R. Dec. at 53. Defendant proved that the reason for the termination of defendant (as general manager or as cutting room supervisor) was one of economy. The Court once again, this time examining Puerto Rican law conclude that "the evidence as a whole ... [fails to] infer that the employers decision was motivated by age animus". *Hidalgo v. Overseas Condado Ins. Agencies, Inc.* 120 F.3d at 335.

### VI. Conclusion

The Court finds that Mr. Maldonado has failed to establish that he was discriminated against on the basis of age under either ADEA or the standard of the Puerto Rico Anti-discrimination statute, or that his termination was unjustified. The complaint is therefore dismissed.

IT IS SO ORDERED.

---

**7.** Law 100 incorporates for the definition of "just cause" that of Law 80 of 1976. *Baez Garcia v.* *Cooper,* 120 P.R. Dec. at 155.