**Michael AMICO, Plaintiff,**

**v.**

**NEW CASTLE COUNTY, a political subdivision of the State of Delaware, Commission on Adult Entertainment, an entity within the State of Delaware, Department of Administrative Services, Division of Business and Occupational Regulation, and the State of Delaware, Defendants.**

**Civ. A. No. 82–513 CMW.**

United States District Court,
D. Delaware.

Feb. 11, 1987.

984

Joseph A. Hurley, Wilmington, Del. (Lewis H. Robertson of Levy & Robertson, Asbury Park, N.J., of counsel), for plaintiff.

Howard M. Berg and Michael K. Tighe of Berg & Associates, Wilmington, Del., Scott A. Green and Donald E. Marston, of New Castle County Law Dept., Wilmington, Del., for defendant, New Castle County.

John J. Polk, Deputy Atty. Gen., Dept. of Justice, Wilmington, Del., for defendant, the State of Delaware.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

The Court must decide whether to award attorneys' fees to a party that successfully challenged, on First Amendment grounds, a county ordinance that, among other things, forbade the construction of an "adult entertainment center" proximate to residential areas.

The precise question presented today is whether this Court may award attorneys' fees when the party submitting the fee request fails to comply with a deadline established by local rules. The Court will grant plaintiff's motion for fees.[1]

An ancillary question is whether the Court may adjust a fee award upward to compensate for the undesirability of the case, the delay in payment or the risk of non-payment. A multiplier for only the last two factors will be allowed.

## I. FACTS

Plaintiff, Michael Amico, applied in 1978 for a license to open an "adult entertainment center" in New Castle County. He was denied the license and filed a lawsuit on August 9, 1982 to challenge the constitutionality of the County's land use ordinances. The contested provision requires that "adult" uses be located at least 500 feet from property used solely for residential purposes and that such uses obtain a special permit.

The action, brought pursuant to 42 U.S.C. § 1983, sought an injunction against enforcement of the land use provisions, damages for the alleged violations of plaintiff's civil rights, costs and attorneys' fees. Plaintiff's core contention was that defendants violated his First Amendment rights by denying his permit. The Court granted plaintiff's motion for summary judgment, holding that the 500–foot residential spacing and permit requirements were unconstitutional, and enjoined the County from enforcing those provisions. *Amico v. New Castle County*, 571 F.Supp. 160 (D.Del. 1983).

In August, 1983, defendants applied for an order modifying the Court's Opinion because another provision of the county ordinances operated to bar plaintiff's zoning permit. This church/school spacing provision requires that adult entertainment centers cannot be located within 2800 feet of a church, school or other place of worship.[2] The Court modified its earlier opinion on September 23, 1983 to clarify that the County could enforce the church/school spacing portion of the ordinance. *Amico v. New Castle County*, 571 F.Supp. at 173.

The Court subsequently permitted plaintiff to amend his complaint to seek a determination that the church/school provision was not applicable to him or was unconstitutional. In an April 6, 1984 Opinion, the Court determined, *inter alia*, that, absent a trial, the Court could not rule that the church/school spacing requirement was unconstitutional on the equal protection, due process and establishment clause grounds asserted by Amico. The Court consolidated the trial on the merits with the hearing on plaintiff's request for a preliminary injunction. *Amico v. New Castle County*, 101 F.R.D. 472 (D.Del.1984). The proceedings were subsequently bifurcated to have

---

1. Plaintiff's motion is brought pursuant to the Civil Rights Attorneys' Fees Award Act of 1976, 42 U.S.C. § 1988 (1982). The Act authorizes courts to award reasonable attorney's fees to prevailing parties in specified civil rights litigation.

2. New Castle County Ord. 23–33(13) provides: "No such uses shall be permitted within 2800 feet of a school, church or other place of worship." For a full analysis of the relevant provisions, *see* 571 F.Supp. at 162 to 164 and 553 F.Supp. 738 at 739 to 741.

one·trial on liability and another trial, if necessary, on damages.

After a two day trial, the jury returned a verdict in favor of the County. On the following day, July 19, 1984, the Court entered a "Judgment on Special Verdict" holding that "in accordance with the Special Verdict of the Jury and the Opinion of the Court, dated April 6, 1984 ... all relief requested by plaintiff is denied and judgment entered for defendants."

On August 31, 1984, Amico filed a Notice of Appeal to the Third Circuit.[3] The Third Circuit Merits Panel affirmed this Court on June 6, 1985. *Amico v. New Castle County*, No. 84–5603, Slip Op. at 1 (3d Cir. May 14, 1985) [770 F.2d 1066 (table) ].

Plaintiff next filed a motion for summary judgment seeking damages in connection with the invalidated residential spacing provision. The District Court, *sua sponte*, requested briefing on the issue of whether its earlier judgment of July 19, 1984 barred further litigation under the doctrine of res judicata. On July 11, 1986, the District Court entered an Order stating that its July 19, 1984 Order was a final judgment which had denied all relief requested by plaintiff, and had barred further proceedings. This Court, accordingly, denied Amico's motion for summary judgment or, in the alternative, for a trial date.

Plaintiff filed a Notice of Appeal to the Third Circuit from the District Court's Order on July 21, 1986. Briefing is completed and the matter is ripe for decision, although no date for oral argument is scheduled.

On September 5, 1986, plaintiff filed a Notice of Motion for Entry of Order Awarding Costs to Plaintiff Pursuant to 42 U.S.C. § 1988. Defendant, New Castle County, objects to plaintiff's application for attorneys' fees.

## II. DISCUSSION

While conceding that plaintiff is a prevailing party, defendant asserts that plaintiff's failure to timely apply for attorneys' fees bars his recovery. Defendant constructs three alternative theories: (1) the doctrine of res judicata bars plaintiff's motion; (2) plaintiff did not comply with the Delaware local rules prescribing the timing of attorneys' fees applications; and (3) the timing of plaintiff's application for attorneys' fees harmed defendant. The Court is persuaded by none of these theories.

### A. A Prevailing Party Under § 1988

■ Plaintiff brought his motion for attorneys' fees under the 1976 Civil Rights Attorneys' Fees Award Act, 42 U.S.C. § 1988, which grants the Court discretion to award reasonable attorneys' fees to prevailing plaintiffs in civil rights actions.[4]

A typical formulation is that "plaintiffs may be considered prevailing parties for attorneys' fees purposes if they succeed on

---

3. Plaintiff characterized his motion as an interlocutory appeal arising from the District Court's Order denying his request for a preliminary injunction. 28 U.S.C. § 1292(a)(1). The County moved to dismiss Amico's appeal on the ground that the July 19, 1984 Judgment on Special Verdict of this Court was a *final decision*, not an interlocutory order as Amico claimed. Plaintiff argued that the July 19th decision did not adjudicate all claims between the parties because the judgment did not address the question of damages allegedly owed to plaintiff for denial of his constitutional rights between January 17, 1979, when the Delaware Commission on Adult Entertainment Establishments denied his application for a license because of the County's residential spacing requirement, and August 14, 1979, when the County first adopted the church spacing requirement. As an alternative argument, Amico asked that his appeal be treated as one from

a final decision under 28 U.S.C. § 1291 if the July 19, 1984 Judgment were considered a final decision.

The Third Circuit characterized Amico's motion as an appeal "from a final order of the District Court." The Third Circuit did not discuss further the parties' dispute over whether this Court's judgment was final or interlocutory.

4. 28 U.S.C. § 1988 provides:

In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318 [20 U.S.C. §§ 1681 et seq.], or title VI of the Civil Rights Act of 1964 [42 U.S.C. §§ 2000 et seq.], the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

any significant issue which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). Defendant does not contest that plaintiff is a prevailing party within the ambit of the statutory section.

During the course of this protracted litigation, plaintiff successfully persuaded the Court that New Castle County's residential spacing and special permit provisions were unconstitutional. He succeeded in convincing the Court to enjoin the County from enforcing those provisions against him. He also established his prima facie right to damages. *Amico v. New Castle County,* 553 F.Supp. 738 (D.Del.1982); *Amico v. New Castle County,* 571 F.Supp. 160 (D.Del.1983). In response to the Court's earlier provision, the County repealed the special permit requirement and amended its residential spacing restriction to ameliorate any constitutional infirmity. As a prevailing party, plaintiff is presumptively entitled to attorneys' fees. *Newman v. Piggie Park Enterprises,* 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968) (a successful plaintiff should ordinarily recover attorneys' fees unless special circumstances would render such an award unjust); *Ellwest Stereo Theatre, Inc. v. Jackson,* 653 F.2d 954, 955 (5th Cir.1981) (discretion to deny fees to prevailing party has been said to be exceedingly narrow).

### B. Res Judicata

While conceding that plaintiff is a prevailing party, defendant contends that any fee recovery is barred by the doctrine of res judicata. This argument suggests that just as this Court's July 19, 1984 judgment barred further litigation on the question of damages, so should it bar additional litigation over attorneys' fees. Defendant's argument, however, fails because it ignores the distinction between proceedings on the merits and proceedings for attorneys' fees.

This distinction is critical given the meaning of res judicata accepted by this Court. The precise definition of res judicata is one attorneys have debated for centuries. The litany of preclusion concepts includes "merger", "bar", "causes of action", "collateral estoppel", "claim preclusion" and "issue preclusion". This Court, however, adopts the Supreme Court's definition of res judicata: "the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit." *Migra v. Warren City School District,* 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984), *quoted with approval in Neoplan U.S.A. Corp. v. Taylor,* 604 F.Supp. 1540, 1543 (D.Del.1985). Res judicata, therefore, may be defined as "claim preclusion". *Id.* See also *Albanese v. Emerson Elec. Co.,* 552 F.Supp. 694 (D.Del.1982); *U.S.A. Corp. v. Taylor,* (1982); *Aiello v. City of Wilmington,* 470 F.Supp. 414 (D.Del.1979), *aff'd.,* 623 F.2d 845 (3d Cir.1980).

▪ Defendant urges that, under the doctrine of res judicata, this Court's July 19, 1984 judgment bars plaintiff from applying for any further relief, including attorneys' fees. Further, defendant argues, it was incumbent upon plaintiff to file a motion under Rule 59(e) of the Federal Rules of Civil Procedure to modify the judgment to seek attorneys' fees.[5]

But, proceedings for attorneys' fees under § 1988 are separate and distinct from proceedings on the merits. Motions for attorneys' fees are normally taken after the entry of final judgment, precluding any contention that the matter "should have been advanced in an earlier suit." The Fees Act provides for awards of attorneys' fees only to a "prevailing party"; the Court's decision of entitlement to fees cannot even commence until one party has "prevailed". *White v. New Hampshire*

---

**5.** Defendant argues that plaintiff should have applied under Rule 59(d) of the Federal Rules to modify the judgment. Defendant's Answering Brief at 8. Rule 59(d) permits the Court on its own initiative to order a new trial within 10 days after a judgment. Rule 59(d) Fed.R.Civ.P. Presumably, defendant means that plaintiff should have applied under Rule 59(e) to alter or amend the judgment. Rule 59(e) Fed.R.Civ.P.

*Dept. of Employment Security*, 455 U.S. 445, 451, 102 S.Ct. 1162, 1166, 71 L.Ed.2d 325 (1982). "Nor can attorneys' fees fairly be characterized as an element of 'relief' indistinguishable from other elements. Unlike other judicial relief, the attorneys' fees allowed under § 1988 are not compensation for the injury giving rise to an action" ... holds the Supreme Court. "Their award is uniquely separable from the cause of action to be proved at trial." *Id. See Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Knighton v. Watkins*, 616 F.2d 795, 797 (5th Cir.1980) ("[A] motion for attorneys' fees is unlike a motion to alter or amend a judgment. It does not imply a change in the judgment, but merely seeks what is due because of the judgment. It is, therefore, not governed by the provisions of Rule 59(e)", *quoted with approval in White*, 455 U.S. at 452, 102 S.Ct. at 1166–67).

The Supreme Court in *White* held that application of Rule 59(e) to § 1988 fee requests is neither "necessary nor desirable to promote finality, judicial economy, or fairness." *Id.* The court recognized that § 1988 is designed in part to encourage private attorneys to vigorously prosecute civil rights violations and litigate constitutional questions. In many of these cases, especially in those involving "relief of an injunctive nature that must prove its efficacy only over a period of time," the Court acknowledges that "many final orders may issue in the course of the litigation." *Bradley v. Richmond School Bd.*, 416 U.S. 696, 722–23, 94 S.Ct. 2006, 2021–22, 40 L.Ed.2d 476 (1974) *quoted with approval in White*, 455 U.S. at 453, 102 S.Ct. at 1167. "Yet sometimes it may be unclear even to counsel which orders are and which are not final judgments." If Rule 59(e) were applicable, counsel would forfeit their right to fees if they did not file a request in conjunction with each "final" order. *Id.* at 453, 102 S.Ct. at 1167.

The reasons enumerated by the Supreme Court in *White* are peculiarly apposite to the case at bar. This protracted constitutional litigation has been in this Court for over four years. And when plaintiff first filed his complaint on August 9, 1982, he had already been seeking a permit to operate his establishment for an additional four years. *See Amico v. New Castle County*, 553 F.Supp. 738 (D.Del.1982). By successfully persuading the Court to enjoin the County from using its ordinance to violate plaintiff's First Amendment rights, plaintiff achieved precisely the type of temporary, if ultimately pyrrhic victory, that the Supreme Court identified in *White*. *Amico v. New Castle County*, 571 F.Supp. 160, 173 (D.Del.1983). No matter what one thinks of the First Amendment right asserted by plaintiff, or of his ability to prevail over the long course of this marathon litigation, with respect to the County's restrictive special permit/residential ordinance, plaintiff is a prevailing party.

Because Rule 59(e) does not apply to requests for attorneys' fees, and because their award "is uniquely separable from the cause of action to be proved at trial," this Court holds that plaintiff's motion for attorneys' fees is not barred by the doctrine of res judicata.

*C. Compliance With The Local Rules*

Defendant's second argument is that plaintiff failed to comply with the Delaware local rules governing the amount of time a party has to file for attorneys' fees. The Court finds that the plaintiff did not technically comply with the rules. But the rules provide this Court with discretion in allowing motions for attorneys' fees and the Court will allow this motion in order to serve the purposes of 42 U.S.C. § 1988.

Under the Local Rules of Civil Practice for the United States District Court for the District of Delaware, a plaintiff must file his motion for attorneys' fees, when an appeal is taken, no later than 21 days after receipt of the mandate[6] of the Third Circuit Court of Appeals.[7]

---

**6.** A mandate is an "[o]fficial mode of communicating judgment of appellate court to lower court, directing action to be taken or disposition to be made of cause by trial court." *Black's Law Dictionary* (5th ed. 1979).

**7.** Rule 6.3(A) provides:

 Unless otherwise ordered by the Court, awards of attorneys' fees will not be made until after the time has run on the judgment for which fees are sought. In the event no

The mandate from the Third Circuit was received on June 6, 1985. Under Rule 6.3(A), the plaintiff would have to file a motion for attorneys' fees 21 days after this date—on June 27, 1985.[8] In fact, plaintiff did not file a motion for fees until September 5, 1986, more than one year later.[9]

In response, plaintiff asserts that his delay in filing his application for attorneys' fees was not unreasonable for two reasons: (1) plaintiff intended to make his application following the entry of final judgment; and (2) plaintiff reasonably believed the Court's Judgment on Special Verdict of July 19, 1984 to be an interlocutory order. Plaintiff's Memorandum of Points and Authorities Supplementing Application for Entry of Order Awarding Costs Pursuant to 42 U.S.C. § 1988 at ¶ 8. Plaintiff thoroughly examines the differences between an interlocutory judgment and a final order. Plaintiff's Reply Memorandum at ¶ 10.

Plaintiff argues that it was not known until July 11, 1986 that the Court's July 19, 1984 Judgment on a Special Verdict was a final order. Therefore, argues the plaintiff, its delay was not unreasonable. All this is beside the point.[10] The language of the local rule speaks only of the mandate of the appellate court. It draws no distinction between an interlocutory appeal or final decision on the one hand, and a final order on the other hand. Plaintiff cites *Inmates of Allegheny County Jail v. Pierce*, 716 F.2d 177 (3d Cir.1983), for the proposition that a delay is not unreasonable when the plaintiff does not know whether a court order is final or not. But *Inmates* stands for no such proposition. *Inmates* involved a case where there was no local rule regarding the timeliness of the application for attorneys' fees. *Inmates*, 716 F.2d at 179.

Even assuming that it makes a difference that plaintiff did not know whether the Judgment on Special Verdict was a final order, it became known to plaintiff

---

appeal is taken, any motion for fees shall be filed no later than 21 days after the time for appeal has expired. In the event an appeal is taken, motions for awards of attorneys' fees shall be filed no later than 21 days after receipt of the mandate of the appellate court. Motions for fees filed while an appeal is pending may be held in abeyance by the District Court.

**8.** Rule 6.3(B) has no application here, and plaintiff does not suggest that it does, because the Court's Order of July 19, 1984 was deemed to be a final order by this Court's Order of July 11, 1986. Rule 6.3(B) only concerns applications for attorneys' fees when no final order has been rendered by a court.

**9.** Six dates are important to this motion:

1. August 12, 1983—Defendant enjoined from enforcing the residential spacing ordinance.

2. July 19, 1984—This Court issues a Judgment on Special Verdict upholding the County's church/spacing ordinance and denying all relief to plaintiff.

3. March 14, 1985—Third Circuit Judgment Order affirms the District Court Opinion which it characterizes as a "final order."

4. June 6, 1985—The mandate from the Third Circuit is received.

5. July 11, 1986—The District Court rules that its Order of July 19, 1984 was a Final Order.

6. September 4, 1986—Plaintiff files a motion for attorneys' fees.

**10.** It is now settled in this Circuit that the orders disposing finally of the merits of a case are appealable even though the questions relating to attorneys' fees have been left undetermined. *Halderman v. Pennhurst State School & Hospital*, 673 F.2d 628 (3d Cir.1982) (Sur Petition for Rehearing En Banc), *cert. den.*, 465 U.S. 1038, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1984). *See also DeLong Corp. v. Raymond Intern., Inc.*, 622 F.2d 1135, 1138–39, n. 3 (3d Cir.1980); *Baughman v. Cooper-Jarrett, Inc.*, 530 F.2d 529, 531 n. 2 (3d Cir.), *cert. denied*, 429 U.S. 825, 97 S.Ct. 78, 50 L.Ed.2d 87 (1976). *See also West v. Keve*, 721 F.2d 91 (3d Cir.1983) (holding that an appeal on the merits of the predicate case must be filed within the requisite time period following entry of judgment thereon, notwithstanding that an attorneys' fee petition may also be, or has been, filed). This line of cases should have alerted both litigants that the question of attorneys' fees would be decided separately from any judgment on the merits.

that the July 19, 1984 order was final on July 11, 1986. Even so, plaintiff did not make a motion for attorneys' fees until September 4, 1986—over 55 days later. This is still beyond the 21 day limit established by the rule.

The real question is whether the Court has discretion to allow the motion for attorneys' fees when a local rule is not complied with. Assuming it does, the Court must then decide whether the defendant was surprised or prejudiced by plaintiff's unseasonable motion for attorneys' fees.

### 1. Other Districts

Other district courts have denied untimely postjudgment motions for attorneys' fees. In *Zentek Corp. v. I.R.S.*, 596 F.Supp. 324, 325 (E.D.Mich.1984), the plaintiff did not move for attorneys' fees until five and one-half months after the case was dismissed. The local rules required that the motion be filed within 30 days. *Id.* at 325. The court, recognizing that *White* provided that "district courts would be free to adopt local rules establishing standards for timely filing of requests for costs ...", held that an untimely motion must be denied. *Id.* at 326. *Zentek* is distinguishable from the present case, however, because the fees in *Zentek* were awarded pursuant to the Freedom of Information Act, 5 U.S.C. § 552(a)(4)(E), so that the policy considerations expressed in *White* regarding the purposes of awarding fees under § 1988 do not apply. Further, the language of the local rules for the Eastern District of Michigan required that "failure to file the application within the time specified shall be considered a waiver of the right to attorneys' fees." *Id.* at 325. No such mandatory language is contained in the Local Rules for the District of Delaware.

In *Pitts v. Freeman*, 755 F.2d 897 (11th Cir.1985), the Eleventh Circuit Court of Appeals upheld the denial by the district court of a motion for attorneys' fees because of failure to promptly file. The plaintiff in that case filed a motion for attorneys' fees pursuant to § 1988 three months after en-

try of a district court judgment. The local rule in the Northern District of Georgia required that the plaintiff file the motion within 15 days of entry of final judgment. *Id.* at 897. But again, the local rules were written differently than those of Delaware. The Georgia rules also contained mandatory language that "failure to comply with the provisions of this rule will be construed as a waiver and abandonment of any claims to recover attorneys' fees pursuant to 42 U.S.C. § 1988." No such mandatory language is contained in the Delaware rules.

*Pitts* further relied on the peculiar language of the Georgia rules. The local rules requires the motion to be filed after a "final judgment". But the *Pitts* court noted that "given the nature of such civil rights cases, there could be no certainty as to timeliness requirements if the phrase 'final judgment' in [the Georgia local rules] were interpreted as meaning the final judgment which may, some day, be entered to terminate the case." *Id.* at 898. The Court rejected plaintiff's argument that the judgment of the District Court was not final simply because it had not been appealed. *Id.* at 898. In lending certainty to the timeliness requirements, by interpreting the phrase "final judgment" in the Georgia local rules, the Eleventh Circuit tried to follow the *White* opinion.

### 2. White Applied To Delaware

■ But the timing of an attorneys' fees motion in Delaware does not turn on an interpretation of what constitutes a final judgment. Rather, Delaware local rules are more broadly drafted. Rule 6.3(A) speaks of a "judgment for which fees are sought", not of "final judgments". The need for certainty in determining when there is a final judgment is not present in the Delaware context. Rather, the critical time period is 21 days after the mandate has issued from the Appellate Court.

*Pitts* suggested that the purpose of *White*, and rulings of the Eleventh Circuit, was to provide certainty in the setting of attorneys' fees. *Id.* at 898. But the purpose of *White* was not to establish certain-

ty requirements; rather, it was to provide district courts with more discretion and flexibility in entertaining motions for attorneys' fees that are filed during various stages of complex litigations. *See White,* 455 U.S. at 453, 102 S.Ct. at 1167.

This case is governed by *White.* That decision left open the question of whether the Supreme Court intends that when the districts establish their local rules, each district court retains discretion to overlook tardy filings.[11] This Court will exercise the discretion provided to it by both § 1988, and the local rules. Delaware Local Rule 6.3(A) provides that "unless otherwise ordered by the Court", attorneys' fees awards are not to be made until after the time for an appeal has run.

The district courts are permitted to both make and amend rules governing their practice and to regulate their practice in any manner not inconsistent with the Federal Rules of Civil Procedure, Fed.R.Civ.P. 83. The rules are to be construed "to secure the just, speedy, and inexpensive determination of every action." Fed.R. Civ.P. 1. This liberal gloss on the district court's interpretation of the rules has caused many courts to overcome procedural technicalities while ruling on the merits and dispensing substantial justice. *Williams v. Keyes,* 125 F.2d 208 (5th Cir. 1942), *cert. denied,* 316 U.S. 699, 62 S.Ct. 1297, 86 L.Ed. 1768 (1942). *See also Ark-Tenn Distributing Corp. v. Breidt,* 209 F.2d 359 (3d Cir.1954) (technical considerations will not be allowed to prevail to the detriment of substantial justice); *Fierstein v. Piper Aircraft Corp.,* 79 F.Supp. 217 (M.D.Pa.1948) (spirit of rules is to settle controversies upon their merits rather than to dismiss them on technical grounds).

This Court, deploying the discretion granted by § 1988, the *White* opinion, and Local Rule 6.1(A) determines that plaintiff, as a prevailing party, is entitled to fees despite his failure to comply with the timeliness requirements of the local rules.

### D. Unfair Surprise or Prejudice

■ This Court also exercises its discretion to decide this attorneys' fees motion in a manner comporting with the underlying purposes of *White*—to ensure that a post-judgment motion does not "unfairly surprise or prejudice" the affected party.

Defendant argues that it was unfairly prejudiced by plaintiff's tardy motion for attorneys' fees because it was not covered by insurance when plaintiff made the motion, and would have been covered when plaintiff should have made the motion. Defendant argues that plaintiff should have applied for fees and costs in June, 1985. At that time, the County claims it was covered by a Midland Insurance Company policy. Defendant's Answering Brief at 13.

But plaintiff correctly counters that paragraph IV(a)(13) of the policy excludes coverage for wrongful acts committed by the County prior to the retroactive date scheduled in Item F of the Declarations to the policy. The retroactive date is February 1, 1979. The event about which plaintiff complained—the application of the County's residential spacing restrictions to deny an adult entertainment license—occurred on January 17, 1979, when the Commission unanimously adopted an order to that effect. *Amico v. New Castle County,* 571 F.Supp. 160, 162 (D.Del.1983). The express terms of the County's policy denies insurance coverage to the County, so there could have been no prejudice. Further,

---

**11.** The *White* court stated:

> Section 1988 authorized the award of attorneys' fees "in [the] discretion" of the court. We believe that this discretion will support a denial of fees in cases in which a *post-judgment motion unfairly surprises or prejudices the affected party.* Moreover, the district courts remain free to adopt local rules establishing timeliness standards for the filing of claims for attorneys' fees. And, of course, the district court generally can avoid piecemeal appeals by promptly hearing and deciding claims to attorneys' fees. Such practice normally will permit appeals from fee awards to be considered together with any appeal from a final judgment on the merits.

*White,* 455 U.S. at 454, 102 S.Ct. at 1167–68. (emphasis added).

any coverage that defendant may have had may well have been covered by the Delaware Insurance Guaranty Association under 18 *Del.C.* § 4201, et seq. *See* Defendant's Answering Brief at 123. Plaintiff's Reply Brief at ¶ 25.

The Court concludes that because defendant was not unfairly prejudiced or surprised, plaintiff's motion for attorneys' fees is granted.

### E. Computation Of The Fee

The American rule on attorneys' fees, historically, provides that all parties to a litigation bear their own costs and attorneys' fees. But the rise of the "private attorney general" concept led to the enactment of the Civil Rights Attorneys' Fees Awards Act of 1976, 42 U.S.C. § 1988 (1982), authorizing the courts to award reasonable fees to prevailing parties in select civil rights litigation. The precise amount awarded was initially left to the courts' discretion. In *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir.1973) (*Lindy I*), however, the Third Circuit led the way in applying the lodestar approach to attorneys' fees. *See Court Awarded Attorney Fees*, 108 F.R.D. 237, 243 (1985). The lodestar is simply the number of hours reasonably expended by counsel multiplied by a reasonable hourly rate for the attorney's services. The hourly rates vary according to the experience of the attorney. The lodestar is then increased or decreased

depending on the case involved and the nature of the attorney's work. *See Hensley*, 461 U.S. at 433, 103 S.Ct. at 1939.

The fee claimed by plaintiff in this action is only for services performed by the plaintiff's attorney with respect to the validity of the residential spacing and special permit provisions and the plaintiff's entitlement to damages by reason of their application to him. No fees are claimed for any services performed in connection with plaintiff's separate challenge of the county's church/school spacing restriction. Plaintiff's Opening Brief at 10. The lodestar fee requested by plaintiff is $40,-266.00.

■ This lodestar, under the approach originated in *Lindy* and developed in *Hensley*, does not end the inquiry. The Court may then consider several enhancement factors—such as the novelty of the question presented and the time and labor required.[12] A number of these factors justify the application of an upward adjustment of the lodestar fee.[13]

Plaintiff requests an enhancement factor of 50% applied to total attorneys' fees of $40,266. This would amount to a total award of $60,399. This upward adjustment is based on three factors: (1) the undesirability of this case; (2) the risk that plaintiff would not prevail and, therefore, could not pay any significant portion of his legal fees; and (3) the time value of the fees earned which were earned more than three years ago.

---

**12.** The *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

**13.** *Hensley*, 461 U.S. at 434, 103 S.Ct. at 1939–40. The district court may also consider other factors identified in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–719 (5th

Cir.1974), though it should note that many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate. [citations omitted].

District courts should not end their fee inquiries when they have multiplied a customary hourly rate times the reasonable number of hours expended, and then check the product against the results obtained. They should also consider both delays in payment and the pre-litigation likelihood that the claims which did in fact prevail would prevail. [citations omitted] ...

*Hensley*, 461 U.S. at 448–449, 103 S.Ct. at 1947 (Brennan, J. concurring in part and dissenting in part).

### 1. The Lodestar

The proper first step in computing attorneys' fees is to multiply "the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Blum v.* *Stenson,* 465 U.S. 886, 888, 104 S.Ct. 1541, 1544, 79 L.Ed.2d 891 (1984). This is the lodestar.

The lodestar requested by plaintiff is as follows:

| Attorney | Hours | Hourly Rate | Total Fee |
|---|---|---|---|
| Philip B. Beardsley | 11.3 | $100.00 | $ 1,130.00 |
| John T. Gondolpho | 10.6 | 75.00 | 795.00 |
| Joseph A. Hurley | 5.0 | 115.00 | 575.00 |
| Robert E. Levy | 14.5 | 150.00 | 2,175.00 |
| Alfred J. Lindh | 14.35 | 100.00 | 1,435.00 |
| John S. Malik | 1.7 | 100.00 | 170.00 |
| Lewis H. Robertson | 271.6 | 125.00 | 33,950.00 |
| Jan Rodgers | .9 | 40.00 | 36.00 |
| TOTAL | | | $40,266.00 |

The Court must first scrutinize the assumptions underlying the lodestar and then proceed to apply any multipliers that may be warranted.

### a. The Standard

■ The award of a reasonable attorney's fee is within the district court's discretion. *Lindy Bros. Builders, Inc. v. American Radiator & Standard Corp.,* 540 F.2d 102, 115 (3d Cir.1976) (*Lindy II*). But because the question of attorneys' fees has led to an explosion of litigation in all Circuits—especially in this Circuit following the seminal *Lindy I* lodestar opinion— the Court must carefully outline the standards of review and procedures employed to analyze the lodestar.

■ Absent error of law, determination of the reasonableness of the fee is for the district court.[14] *Ursic v. Bethlehem Mines,* 719 F.2d 670, 675 (3d Cir.1983). The Supreme Court regards this discretion as appropriate "in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941.

*Ursic* attempted to reconcile the hundreds of attorneys' fee decisions inundating the Third Circuit since *Lindy I,* to provide specific guidance to courts attempting to

**14.** In *Lindy II,* the Third Circuit defined discretion:

Discretion is abused when the judicial action is arbitrary, fanciful or unreasonable, which is another way of saying that discretion is abused only where no reasonable man would take the view adopted by the trial court. If reasonable men could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion [citing cases]. Thus, one may attack an exercise of discretion as 'irrational'. One seeking to establish such an abuse of discretion, however, assumes a heavy burden [citation omitted]. *Lindy I* and *Merola I* both emphasize that the appellate court may also find an abuse, or more accurately a 'misuse', of discretion where the trial court utilizes improper standards or proce-

dures in determining fees. *Lindy I,* 487 F.2d at 166; *Merola v. Atlantic Richfield Co.,* 493 F.2d 292, 295 (3d Cir.1974) (*Merola I*). Similarly, a clearly erroneous finding of fact may require reversal. *Id.*

The reasoning of *Lindy II* was most recently upheld in *Delaware Valley Citizens' Council v. Com. of Pa.,* 762 F.2d 272, 282 (3d Cir.1985). There the Third Circuit held that an appellate court may not upset a trial court's exercise of discretion on the basis of a "visceral disagreement with the lower court's decision. [I]f the district court has applied the correct criteria to the facts of the case, then, it is fair to say that we will defer to its exercise of discretion." *Id.* at 282, *quoting Lindy II,* 540 F.2d at 116, *citing Katz v. Carte Blanche Corp.,* 496 F.2d 747, 756 (3d Cir.1974) (en banc), *cert. denied,* 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974).

calculate the lodestar and any multipliers thereto.[15]

The Court cautions that:

many lawyers and some district judges believe that once a fee applicant has touched all the *Lindy* bases, he or she is home free. They appear to think that it is only necessary to prepare a neat compilation of dates and hours, add a subjectively appealing percentage augumentation, and the fee will emerge in a readout of deceptive exactness—a computation untouched by human hands or the power of reason. As our disposition of the present case should make clear, this view is not correct. In all phases of the fee determination, the district judge must cast a critical eye on the award request.

*Ursic*, 719 F.2d at 677.

To provide specific guidance, the Third Circuit suggests that district courts should first examine "how many hours were spent *in what manner* by which attorneys.... After determining ... the services performed by the attorneys, the district court must [then] attempt to value those services." *Lindy I*, 487 F.2d at 167 (emphasis added). This formulation suggests a bifurcated inquiry into reasonableness: a determination of a reasonable hourly rate and a determination of whether it was reasonable

to expend the number of hours in a particular case. *Ursic*, 719 F.2d at 677. A predicate to performing this analysis into reasonableness is the court's ascertainment of whether the hours claimed are adequately documented.[16]

The Third Circuit further requires that any inquiry into reasonableness scrutinize the quality of the hours spent by attorneys. An attorney cannot insist on a hefty hourly rate—based on his reputation or familiarity with the applicable law—and then spend an inordinate amount of time researching that same law. "Double dipping, in any form, cannot be condoned," holds the Third Circuit. "Our cases supply no authority for rewarding non-stop meter running in law offices." *Ursic*, 719 F.2d at 677; *see Prandini v. National Tea Co. (Prandini I)*, 557 F.2d 1015, 1020 (3d Cir.1977).

 Another practice that is not condoned is the wasteful utilization of expensive legal talent for work that could be delegated to non-professionals or less experienced people. Routine tasks, if performed by senior people, should not be billed at their usual rates. "A Michelangelo should not charge Sistine Chapel rates for painting a farmer's barn." *Ursic*, 719 F.2d at 677.[17]

---

15. "Although this Court has been faced with a plethora of cases since [*Lindy I*], the fundamental principle has remained constant. We require that district courts, in applying the proper standards, set forth the specific reasons underlying the award—what the Supreme Court has described as the need to provide a concise but clear explanation of its reasons for the fee award." *Hensley*, 461 U.S. at 437, 103 S.Ct. at 1941.

16. The Supreme Court underscores the importance of documentation:

The most useful starting point ... is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.... The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly.

The district court also should exclude from its initial fee calculation hours that were not reasonably expended. Cases may be overstaffed, and the skill and experience of lawyers vary widely. [The district courts] should make a

good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. *Hensley*, 461 U.S. at 433–434, 103 S.Ct. at 1939–1940.

17. Once the *Ursic* safeguards are complied with, the Court must still be certain that the statutory purpose of encouraging impecunious plaintiffs access to the courts is not achieved at the price of a fee so inconsistent with the defendant's violation that it amounts to an "excessively punitive sanction."

A plaintiff is compensated for the wrong done him by the damage recovery. Further redress may come in the form of exemplary damages for egregious conduct or through such statutory penalties as the treble damage award in antitrust cases. The defendant, however, has not violated any duty to the plaintiff's attorney, and it is not the purpose of a fee award to allow the attorney to share in the consequences of the defendant's wrong to the plaintiff. *Ursic*, 719 F.2d at 677.

Congress did not intend the fee awards incentive for private enforcement of the laws to be a

### b. Adequacy of Documentation for Successful Claims

A review of the lodestar fees suggests that there are three categories into which plaintiff's attorneys fall regarding adequacy of documentation. First is the problem of Philip Beardsley, an attorney who met with an untimely death in 1985. There is neither an affidavit nor supporting contemporaneous records to show how many hours Mr. Beardsley worked. Second, although Messrs. Levy, Robertson, Malik and Hurley submitted affidavits attesting to the number of hours they worked, they have provided the Court with no contemporaneous time records. Third, the fee requests of Messrs. Gondolpho and Lindh and Ms. Rogers are all supported by both an accompanying affidavit and contemporaneous time records. These three groupings will be treated separately as the Court inquires first into the adequacy of documentation for work performed on successful claims, and second, into the reasonableness of the hourly rate and hours expended.

### i. Philip Beardsley

 Defendants challenge any award of attorneys' fees for Philip Beardsley on the grounds that there was neither an affidavit nor contemporaneous time records to support his hours. Defendants' Answering Brief at 14. In particular, Philip Beardsley has submitted no affidavit in support of his hours spent. Although contemporaneous time records are the preferred mode of offering proof of time spent on a case, they are not the only method. While mere estimates of time are not sufficient, an allowance of attorneys' fees may be based on a reconstruction, provided that the records are substantially reconstructed and are reasonably accurate. *Delaware Valley Citizens v. Com. of Pa.*, 581 F.Supp. 1412, 1421 (E.D.Pa.1984), *quoting Lindy II*, 540 F.2d at 109. *See also Pennsylvania v. Delaware Valley Citizens'*

*Council*, —— U.S. ——, 106 S.Ct. 3088, 3092 n. 2, 92 L.Ed.2d 439 (1986).

But in *Delaware Valley Citizens*, 581 F.Supp. at 1421, the court would not uphold an attorneys' fee award based solely "on memos drafted for the purpose of relating the time spent." Such is the case with Philip Beardsley's request—there is no affidavit supporting the request, and there are no contemporaneous time sheets. There is only a letter—the equivalent of a memo—dated September July 1, 1980 (sic), on personal stationery, suggesting that Mr. Beardsley performed services from July through August 1983 as a replacement for attorney Lindh. Robertson Aff., Ex. D. Apart from the fact that most of the services were performed after August 12, 1983, the memo does nothing more than outline his request for fees.

Accordingly, the fees requested for Philip Beardsley are denied.

### ii. Malik, Hurley, Levy and Robertson

Levy, Robertson, Malik and Hurley have all submitted affidavits supporting the lodestar request. None of these attorneys, however, has submitted contemporaneous records, except for Lewis Robertson who submitted records for part of the period for which he requests fees.

### a. Malik

Malik requests fees for a short appearance before this Court at oral argument on June 16, 1986. The argument concerned the question of whether this Court's earlier ruling of July 19, 1984 barred any subsequent litigation and specifically prevented plaintiff from seeking damages for the invalidation of the residential spacing permit achieved on August 12, 1983. It could be argued that Malik should not be compensated for the June 16, 1986 hearing because it partially related to the July 19, 1984 decision involving the church/school

license for the bar to inflict punishment. Criminal sanctions are fixed by statute. Congress did not intend, in undertaking to provide plaintiffs with access, to have lawyers run up unchecked fees bearing no relationship to the severity of the defendant's underlying offense. Reasonable fees should assure the plaintiff access to the court and provide the necessary enforcement incentive; they are not, however, the appropriate vehicle for punitive sanctions. *Id.*

spacing provision. But, the subject of the argument was whether plaintiff could get damages for the invalidation of the residential spacing provisions—the provision on which plaintiff prevailed.

 Plaintiff should be compensated for issues related to the residential spacing permit, but not for any work connected with the church/school spacing provision. Plaintiff's Opening Brief at 10, n. 1. Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorneys' fees reduced simply because the district court did not adopt each contention raised by plaintiff. *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1939; *see Delaware Valley Citizens,* 581 F.Supp. at 1420.

Because the argument related to the invalidation of the residential spacing provision, plaintiff should be compensated for it and Malik's hours will be allowed.

#### b. Hurley

 Hurley submits an affidavit to the Court requesting compensation for five hours of work performed on this matter as local counsel. Hurley, however, does not provide contemporaneous records nor does he even mention in his affidavit what he performed. Hurley Aff. There is absolutely no indication of what Hurley's involvement in this case was. Therefore, Hurley stands in a different position than Malik, and Hurley's hours will be denied because they are not adequately documented. *See also Delaware Valley Citizens,* 581 F.Supp. at 1420; *Delaware Valley Citizens' Council,* 106 S.Ct. at 3092 n. 2. If Malik can specifically and accurately account for the 1.7 hours he spent on this case, there is no reason that Hurley cannot detail his five hours of employment.

#### c. Levy

 Attorney Levy submitted an affidavit alleging that he spent 14.5 hours as secondary counsel in this matter. The affiant admits that no contemporaneous time records were maintained, or, in the alternative, that any that were maintained could

be found. Levy Aff. p. 5, ¶ 12. Instead, Levy provides reconstructed estimates of his time spent. Levy Aff., schedule A. Levy has retraced his time spent, much as Mr. Malik has, with reference to particular events. Specifically, Levy requests fees for preparation of correspondence, conferences, the preparation of a memorandum on residential spacing, and file maintenance and review. Levy Aff. at Schedule A.

The Court finds that the request for hours is adequately specific and will be allowed.

#### d. Robertson

 Lewis Robertson, law partner of Levy, and the lead counsel to this case, submits an affidavit requesting compensation for 271.6 hours spent regarding the invalidation of the residential spacing provision. There are two problems with the records submitted by Robertson. First, Robertson has no contemporaneous records for the preparation of file and routine correspondence. Second, Robertson provides no time records for tasks performed prior to October, 1982. But Robertson accounts for his time spent prior to October 16, 1982 in very specific detail, relating each event in which he participated. Moreover, Robertson allocates a minimum amount of time for each review of correspondence or of the files—less than ten minutes each. Robertson Aff., p. 15, ¶ 43, Schedules B and C.

After a careful review, the Court is satisfied that the specificity requirements developed in *Lindy II, Ursic, Hensley, Blum* and *Delaware Valley* have all been satisfied and that the hours proposed by Lewis Robertson are adequately documented.

#### iii. Lindh, Rogers and Gondolpho

 Contemporaneous records demonstrate that attorney Lindh, a partner at a Delaware law firm, performed work on this case, with his associate Gondolpho and a paralegal, Rogers, from June 1982 until June 1983—all on matters relating to this Court's August 12, 1983 opinion establishing plaintiff as a prevailing party. Lindh

Aff. at 2. Lindh, Gondolpho, and Rogers kept careful contemporaneous records detailing their work. Lindh Aff. Ex. A.

### c. Inquiry into Reasonableness of Hourly Rate and the Number of Hours Expended

### i. Hourly Rate

The Court finds that the hourly rate requested by the different counsel that worked on this case are reasonable, except for the rate charged by Mr. Levy which will be reduced from $150 per hour to $125 per hour. An affidavit submitted by a Delaware civil rights attorney, Sheldon Sandler, suggests that his customary hourly rate has been, and is, $130 and that this is commensurate with the hourly rates charged by attorneys in Wilmington and awarded by the courts. Sandler Aff., ¶¶ 7–10. Other courts have awarded the two lead counsel in this case—Levy and Robertson—$125 per hour in similar First Amendment cases. *See L.O.J. v. Bordentown*, L 5071–82 (PW) (1986) and *Farrugio v. Asbury Park*, L 53060–81E. *See also Council Enterprises, Inc. v. Atlantic City*, 200 N.J.Super. 431, 491 A.2d 789 (Law.Div. 1984) (fee award of $200 upheld). *See* Robertson Aff. p. 13, ¶¶ 39, 40. Therefore, a rate of $125 per hour will be allowed for Levy and Robertson.

Lindh and Malik request a rate of $100 per hour. This is supported by their affidavits and was found reasonable by the Eastern District of Pennsylvania. *See Delaware Valley Citizens*, 581 F.Supp. at 1422, and *Delaware Valley Citizens Council*, 106 S.Ct. at 3092. Malik Affidavit ¶ 7.

Working as an associate and paralegal, respectively, for Lindh, Gondolpho and Rogers claim work billed at $75 and $40 per hour. This seems to be the rate that is usual and customary in the area. Lindh Aff., p. 2, ¶ 5. But in *Delaware Valley Citizens' Council*, the court only allowed a fee of $65 for associate work and $25 for paralegal work. *Delaware Valley Citizens' Council*, 106 S.Ct. at 3092. The Court will adopt the lower rates for Gondolpho and Rogers.

### ii. Hours Expended

The Court now turns to the question of the reasonableness of the hours expended on this work. Lindh, Gondolpho and Rogers will be treated under the same standard, because they worked together. According to their contemporaneous records, these three adequately divided their time. The paralegal handled the routine and ministerial work like xeroxing and preparing correspondence. The associate reviewed the files, handled teleconference, and performed research. The partners handled the brief writing and oral argument. Lindh Aff. at Ex. A.

Malik also expended a reasonable amount of time in attending one oral argument. Malik Aff.

A review of Levy's work also suggests that he spent his time, as an attorney of many years experience, properly by concentrating only on writing memoranda, participating in conferences, and preparing important correspondence. All his hours were reasonably expended.

Robertson, however, did not properly spend some of his time. A review of Robertson's contemporaneous records suggests that 16.6 hours were spent working on issues related to the church/school spacing ordinance. Robertson Aff., Sch. C. Plaintiff specifically conceded in his request for fees that no request will be made for hours spent working on the church/school spacing provision. Plaintiff's Opening Brief at 10, n. 1. These hours, therefore, will be disallowed.

A review of the other hours expended by Robertson, however, suggest that they were expended reasonably and meet the requirements of the Third Circuit and the Supreme Court. The hours spent were properly and reasonably divided between preparing discovery materials, pleadings and preparing briefs and memoranda. Robertson Aff. at Schedule B.

The lodestar, taking into consideration the above adjustments, is:

| | HOURS | FINAL LODESTAR HOURLY RATE | TOTAL FEE |
|---|---|---|---|
| Gondolpho | 10.6 | 65 | $ 689.00 |
| Rodgers | .9 | 25 | 25.50 |
| Lindh | 14.35 | 100 | 1,435.00 |
| Malik | 1.7 | 100 | 170.00 |
| Levy | 14.5 | 125 | 1,812.50 |
| Robertson | 255 | 125 | 31,875.00 |
| | | | $36,007.00 |

### 2. Multipliers

The lodestar inquiry does not end the matter. Both the Third Circuit and the Supreme Court have made recent pronouncements regarding the appropriateness of using various multipliers to augment the lodestar.

Using the lodestar as a starting point, the Third Circuit allows adjustments in light of "(1) the contingent nature of the case, reflecting the likelihood that hours were invested and expenses incurred without assurance of compensation; and (2) the quality of the work performed as evidenced by the work observed, the complexity of the issues and the recovery obtained." *Merola v. Atlantic Richfield Co.*, 515 F.2d 165, 168 (3d Cir.1975) (*Merola I*); *Lindy II*, 540 F.2d at 117.

The factors utilized by the Third Circuit differ from the *Johnson Express* twelve factors. The Supreme Court adopts a hybrid approach that shares the elements of both *Johnson*, and the Third Circuit's approach. *Hensley*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). After computing the lodestar, the Supreme Court recognizes that "there remain other considerations that may lead the district court to adjust the fee upward or downward...." *Id.* at 434, 103 S.Ct. at 1940. Taking an expansive view of what "other considerations" might be, the Court holds that "[t]he district court also may consider [the] factors identified in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–719 (5th Cir.1974), though it should note that many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." *Id.* at 434, n. 9, 103 S.Ct. at 1940, n. 9.

The Supreme Court further refined its views on upward multipliers in *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), demonstrating an increasing impatience with attorneys' fees litigation in general and quibbling over multipliers in particular. The *Blum* court restated that the proper first step in determining a reasonable attorney's fee is to multiply "the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Id.* at 888, 104 S.Ct. at 1544. The lodestar is more than a "rough guess" or initial approximation of the final award to be made. Instead, "[w]hen ... the applicant for a fee has carried his burden of showing that the claimed rate and number of hours are reasonable, the resulting product is presumed to be the reasonable fee" to which counsel is entitled. *Id.* at 897, 104 S.Ct. at 1548.

But *Blum* also limited the factors which a district court may consider in determining whether to make adjustments to the lodestar amount. The court expanded on its earlier finding in *Hensley* that many of the *Johnson* factors "are subsumed within the initial calculation" of the lodestar, the Court held that "the novelty [and] complexity of the issues, the special skill and experience of counsel," the quality of representation, and the "results obtained" from the litigation are presumed to be fully reflected in the lodestar amount and thus cannot serve as independent bases for increasing

the basic fee award. *Id.* at 898–900, 104 S.Ct. at 1548–1550. Upward adjustments of the lodestar are still permissible, but such modifications are proper only in certain "rare" and "exceptional" cases, supported by both specific evidence on the record and detailed findings by the lower courts. *Id.* at 898–901, 104 S.Ct. at 1548–1550.

In *City of Riverside v. Rivera,* —— U.S. ——, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986), a plurality of the court ruled that the standard to be applied in reviewing district court fee awards was an abuse of discretion standard. *Id.* 106 S.Ct. at 2693. *See also, Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941. This further encouraged district courts to provide detailed explanations of fee awards.

The Court's most recent pronouncements on attorneys' fees came a few months ago in *Pennsylvania v. Delaware Valley Citizens' Council,* —— U.S. ——, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). In that case, the Court overturned a lower court's allowance of an upward adjustment for "superior work, outstanding result, and contingency." Emphasizing that the ability of counsel should be reflected in reasonable hourly rates, the Court strengthened the presumption that the lodestar figure itself represents a reasonable fee. The court heightened the showing necessary to show exceptional success "to the point where it may be virtually impossible for a plaintiff to meet." *Id.* 106 S.Ct. at 3100 (Blackman, J., dissenting).

While these recent Supreme Court opinions significantly narrow and define the range and type of multipliers allowed in setting attorneys' fees, they did not specifically address the three types of multipliers requested by the plaintiff in the case at bar: (1) for the undesirability of the case; (2) for the delay in payment of the fees; and (3) for the risk that plaintiff would not prevail. The Supreme Court has not addressed the first two factors. The court specifically left open the question in *Blum* of an upward adjustment, based on the likelihood of success, or to put it another way, the risk of loss. *See Pennsylvania v. Delaware Valley Citizens' Council,* 106 S.Ct. 3088, 3100, 92 L.Ed.2d 439 (1986) (restoring case to docket for reargument "insofar as it raises the question whether attorneys fees chargeable to a losing defendant under the Clean Water Act and the comparable statutes may be enhanced based on risk of loss, and if so, to what extent").

### a. Multiplier for the "Undesirability" of the Case

In *Hensley,* the Supreme Court adopted the twelve *Georgia Highway Express* factors. The tenth factor allows for an upward adjustment of the lodestar to account for the "undesirability" of the case. *Hensley,* 461 U.S. at 434 n. 9, 103 S.Ct. at 1940 n. 9. In its later opinions— *Blum, Rivera,* and *Delaware Valley*—the Court nowhere indicated that the "undesirability of the case" should be subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate. At least one other district court, however, has permitted an upward multiplier to take into consideration the undesirability of the case. *Jones v. Federated Dept. Stores, Inc.,* 527 F.Supp. 912 (S.D. Ohio 1981). The court specifically cited the "undesirability of Title VII litigation in general...." as a reason for allowing the upward multiplier. *Jones* at 527 F.Supp. 918.

In representing an adult entertainment entrepreneur, plaintiff's attorneys claim to represent perhaps the paradigm undesirable client. Support for the circumscription of "adult" bookstores, entertainment centers, and movie theaters is widespread. Robertson Aff. pp. 10–11, ¶¶ 29–32. *See also Council Enterprises, Inc. v. Atlantic City,* 200 N.J.Super. 431, 491 A.2d 789 (Law.Div.1984). But the two principal attorneys for plaintiff—Levy and Robertson—make their living representing precisely such unpopular causes and have done so for many years. Robertson Aff. pp. 5–8, ¶¶ 14–23; Levy Aff. pp. 1–5, ¶¶ 2–10. These attorneys typically build

into their fee schedule a factor for undesirability. Robertson Aff. ¶ 39. Plaintiff's attorneys are estopped from asserting that they are entitled to a multiplier for undesirability. Therefore, this Court will not allow a multiplier for the undesirability of the case.

### b. *Multiplier for Delay in Payment*

█ Plaintiff also requests a multiplier for the delay in payment. The Court granted plaintiff's motion to enjoin New Castle County from enforcing its restrictive residential spacing and special permit requirements on August 12, 1983. *Amico v. New Castle County,* 571 F.Supp. 160, 173 (D.Del.1983). Almost four years later, plaintiff's attorneys have received no compensation for achieving this legal victory. Robertson Aff. p. 12, ¶ 36.

The court in *Johnson* did not list delay of payment as one of the twelve factors allowing a multiplier. But a delay in payment could be subsumed under the heading of one of the other twelve factors such as: the customary fee, the time required, time limitations imposed by the client or other circumstances. *See Johnson,* 488 F.2d at 717–719; *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1939–1940. Neither the Supreme Court nor the Third Circuit have expressly addressed the questions of whether an upward multiplier is permitted to reflect the time delay in paying a prevailing parties attorney in a § 1988 action.

Several other courts, however, have awarded fees for a delay in payment. "The lodestar fee may also be adjusted upward to compensate counsel for the lost value of the money he would have received resulting from delay in receipt of payment," holds the United States Court of Appeals for the D.C. Circuit. " '[t]he hourly rates used in the "lodestar" represents the prevailing rates for clients who typically pay their bills promptly. Court awarded fees normally are received long after the legal services are rendered.' " *Nat. Ass'n. of Concerned Vets. v. Sec. of Defense,* 675 F.2d 1319, 1328 (D.C.Cir.1982), *quoting*

*Copeland v. Marshall,* 641 F.2d 880, 893 (D.C.Cir.1980) (en banc).

Any minimal delay may properly be discounted by this Court, as will any delay solely attributable to dilatory actions by plaintiff. *Id.* at 1328. Any claim for an adjustment to compensate for delay must be factually supported and this Court's award must be explained in light of the circumstances of the case. Where the hourly rate used in computing the lodestar is based on present hourly rates, a delay factor has implicitly been recognized and no adjustment for delay should be allowed. *Id.* at 1329. *See also* 641 F.2d at 893 n. 23. *See, e.g., Shaw v. Library of Congress,* 747 F.2d 1469, 1472–73 (D.C.Cir.1984), *rev'd. sub. nom., Library of Congress v. Shaw,* — U.S. ——, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986) (on grounds that increased multiplier on the basis of payment delay would amount to a waiver of the federal government's traditional immunity to payments of interest); *Laffey v. Northwest Airlines, Inc.,* 572 F.Supp. 354 (D.D.C.1983), *aff'd. in part, remanded in part,* 746 F.2d 4 (D.C. Cir.1984); E. Richard Larson, *Federal Court Awards of Attorney Fees,* note 24 at 226–27. *See Murray v. Weinberger,* 741 F.2d 1423, 1432 (D.C.Cir.1984); *Jordan v. United States Dept. of Justice,* 691 F.2d 514, 518 (1982).

In the case at bar, the plaintiff's request for attorneys' fees is based, not on current rates which would incorporate a delay factor, but at rates prevailing in 1982 and 1983. Robertson Aff., p. 13, ¶ 39. Therefore, an upward multiplier to reflect a delay in payment is appropriate.

Although the Third Circuit has not squarely addressed the question of whether a multiplier for a delay in payment is appropriate, its Task Force on Court Awarded Attorneys' Fees specifically recommends an adjustment in the basic fee to reflect "the delay in receiving attorneys' fees." *Court Awarded Attorney Fees,* 108 F.R.D. at 265. The Task Force recommends that the court either "may use a multiplier or may make an award to the attorney under the current scheduled hour-

ly rate rather than the one in force when the work actually was done. An award of interest at an appropriate rate also could be employed to compensate for a delay in payment." *Id.* at 265.[18]

■■■ This Court will allow a percentage multiplier to account for the delay in payment based on an appropriate rate—the rate assessed in Delaware for pre-judgment interest.

The rate of interest allowed on judgments in Delaware is the same as the "legal rate of interest" defined by Delaware statute. *Devex Corp. v. General Motors Corp.*, 569 F.Supp. 1354, 1366 (D.Del.1983), *aff'd.*, 749 F.2d 1020 (3d Cir.1984), *cert. denied,* —— U.S. ——, 106 S.Ct. 68, 88 L.Ed.2d 55 (1985). The Delaware Code provides that "the legal rate of interest shall be 5% over the Federal Reserve discount rate including any surcharge as of the time from which interest is due...." 6 *Del.C.* 2301 (1984).

Interest begins to run from the date of judgment—August 12, 1983. At this date, the federal discount rate was 8.5% *Federal Reserve Bulletin*, December, 1983. This Court will apply a rate of interest of 13.5% from the date of judgment to the date of payment in this action. Post-judgment interest will run at the same rate from the date judgment is entered until the date the judgment is paid. *See Devex, supra*, at 1365–1368.

A multiplier of .135 will be allowed by the Court to compensate for any delay in payment.

### c. Multiplier to Reflect Risk of Nonpayment

One of the *Johnson* factors allowing for an upward multiplier is "whether the fee is fixed or contingent." Courts around the country award multipliers for cases taken on contingency, but more generally for what is now referred to as "risk of loss" or nonpayment risk. Seven of the nine circuits that have considered the matter have allowed an upward multiplier to reflect the risk of nonpayment. The Supreme Court has recently restored the question to the docket for reargument. But the law in the Third Circuit is clear—upward multipliers are permitted for § 1988 cases to reflect the risk of nonpayment.

### 1. The Theoretical Argument In The Circuits

The Court will now consider the theoretical objections to an upward multiplier to reflect the risk of nonpayment. loss. This discussion seeks to address objections to the multiplier raised in other circuits.

Four theoretical arguments are advanced against the nonpayment multiplier. All assume that the legislative history of the Fees Act is inconclusive, an assumption rejected in this Circuit. First, it is argued that the multiplier subsidizes the plaintiff's bar. Second, opponents contend that the incentives to bringing § 1988 actions are already adequate. Third, a multiplier is supposedly unfair to defendants. And, fourth, the multiplier is allegedly a drain on the federal budget.

### a. The Legislative History

■■■ The legislative history for the Fees Act, as interpreted in this Circuit, indicates that Congress specifically authorized a contingency bonus. *See, e.g., Hall v. Borough of Roselle*, 747 F.2d 838, 842–43 (3d Cir. 1984), *citing, Blum v. Stenson*, 465 U.S. 886, 903–904, 104 S.Ct. 1541, 1551, 79 L.Ed.2d 891 (Brennan, J. concurring). Some suggest, however, that the legislative history of the Fees Act is inconclusive. This argument is predicated on the fact that *Stanford Daily v. Zurcher*, 64 F.R.D. 680 (N.D.Cal.1974), a case allowing a contingency multiplier, was cited in the Senate, but not the House report of the Fees Act.

---

**18.** Although the Supreme Court has not addressed the issue, Justice Brennan in *Hensley* argued that "If the rate [of attorney's fees] used in calculating the fee does not already include some factors for—the time value of money, it ought to be enhanced by some percentage figure...." *Hensley,* 461 U.S. at 448–449, 103 S.Ct. at 1947–1948 (1983) (Brennan, J., concurring in part and dissenting in part).

*See Nonpayment Risk Multipliers*, 53 U.Chi.L.Rev. 1074, 1086. Rather, *Johnson* which does not allow a contingency multiplier, should govern because it is cited in both the House and Senate reports. But the Supreme Court has already indicated that it will not consider *Johnson* alone as dispositive on the question of what will be allowed for multipliers. *See Pennsylvania v. Delaware Valley Citizens' Council*, 106 S.Ct. at 3087.

▮ This Court is bound by this Circuit's interpretation of the legislative history. But, assuming that the history is inconclusive, the Court proceeds to discuss the other matters of theory raised by the multiplier.

### b. Subsidizing Plaintiff's Bar

▮ The biggest challenge to the notion of an upward multiplier to reflect nonpayment risk comes from the Seventh Circuit.[19] In *McKinnon v. City of Berwyn*, 750 F.2d 1383 (7th Cir.1984), the Seventh Circuit found that nonpayment risk compensation subsidizes lawyers bringing unsuccessful suits and, therefore, contravenes Congress' explicit intent to limit attorneys' fee shifting to "prevailing parties." *Id.* at 1392. Judge Posner's principal criticism of any risk multiplier is that it subsidizes the plaintiff's bar.[20] Judge Posner took the example of a case with a two percent chance of winning, noting that it would require a risk multiplier of 50. *Id.*

at 1392. His example has been criticized as assuming that an attorney is risk neutral or risk preferring. *See Nonpayment Risk Multipliers*, 53 U.Chi.L.Rev. at 1084 n. 63. *See also Wildman v. Lerner Stores Corp.*, 771 F.2d 605, 612–613 (1st Cir.1985) (criticizing Judge Poser's analysis for failing to consider how relatively modest multipliers have been, i.e., a multiplier of fifty is unreasonable).[21]

The *Berwyn* case is distinguishable from the case at bar. In that case, an attorney fee agreement that provided the lawyer with 40 percent of the damage judgment or the reasonable attorneys' fees awarded by the court—whichever was greater. In Judge Posner's words, this agreement "partially hedged the lawyer against the downside risk of a low damage award." So that the attorney "is not entitled to more insurance in the form of a risk multiplier." *McKinnon*, 750 F.2d at 1382. In the case at bar, however, there is the opposite problem—there is no upside potential contracted for. The attorney will either get the reasonable fee awarded by the court, or he will get nothing because his client is unable to pay for the attorneys' fees. The risk of this nonpayment is what the plaintiff requests a multiplier for.

### c. Adequate Incentives

▮ The second argument against nonpayment risk multipliers is that the incentives to bring civil rights cases are already

**19.** Seven of the nine circuits, including the Third Circuit, have considered the matter and approve the use of upward multipliers to reflect the risk of nonpayment loss. In *Wildman v. Lerner Stores Corp.*, 771 F.2d 605 (1st Cir.1985), the court allowed a fifty percent upward adjustment due to the special difficulties of the case, counsel's "acute understanding of the law", and the "contingency of losing all their time and effort." *See Crumbaker v. Merit Systems Protection Bd.*, 781 F.2d 191, 196–97 (Fed.Cir.1986); *Wildman v. Lerner Stores Corp.*, 771 F.2d 605 (1st Cir.1985); *Kelley v. Metropolitan County Bd. of Educ.*, 773 F.2d 677 (6th Cir.1985); *LaDuke v. Nelson*, 762 F.2d 1318, 1333 (9th Cir.1985); *Sierra Club v. Clark*, 755 F.2d 608, 620 (8th Cir. 1985); *Jones v. Central Soya Co.*, 748 F.2d 586, 591 (11th Cir.1984).

**20.** According to Judge Posner, any upward multiplier subsidizes all plaintiffs when the legisla-

tive history and language of the Fees Act only allows fees to be awarded to "prevailing parties." One criticism of this analysis, however, is that Posner assumes that attorneys regard their cases as a bundle of economic goods, when in fact they may simply look at the risk of each case.

**21.** One commentator argues that an upward risk multiplier would encourage attorneys to bring "frivolous" suits. *Nonpayment Risk Multipliers*, 53 U.Chi.L.Rev. at 1084 n. 63. To suggest this however, is to take economic analysis of the law to its most cynical extreme. To maintain that any amount of money, or any upward multiplier, would induce an attorney to violate the ABA code of ethics by bringing a frivolous suit is not a tenable position. *See Fed.R.Civ.P. Rule 11.*

adequate. In particular there are so-called psychic benefits or non-monetary incentives that motivate civil rights litigation. *See Armstrong v. Reed*, 462 F.Supp. 496, 502 (N.D.Miss.1978), and *Nonpayment Risk Multipliers*, 53 U.Chi.L.Rev. at 1101. To suggest, however, that somehow these non-monetary benefits should enter into a court's calculation in awarding attorneys' fees is to suggest that there is some way to measure psychic benefits. Obviously this cannot be done and courts would have a quite difficult time adjusting all sorts of fee and damage awards to account for the psychic benefits enjoyed by various parties. Moreover, Congress' purpose in enacting the Fees Act to attract "competent counsel" to civil rights litigation was to provide them with monetary incentives to do this work, not to extoll the psychic benefits they receive from practicing civil rights law as it now stands. *See* S.Rep.No. 94–1011, p. 6 (1976); H.R.Rep. No. 94–1558, p. 9 (1976), U.S.Code Cong. & Admin.News 1976, p. 5908. If prevailing incentives were adequate to encourage lawyers to bring meritorious civil rights suits, Congress would not have enacted the Fees Act in the first place.

#### d. Fairness

■ A third rationale offered against contingency multipliers is that somehow these multipliers are "unfair" to defendants.[22] Again, however, Congress was clearly less concerned with the liability of defendants than with providing incentives for plaintiff's counsel to bring civil rights actions. As a measure of fairness, the Fees Act is skewed against defendants to begin with. Other commentators, moreover, suggest that, if anything, "fairness" requires that "those whose violation of the law makes enforcement necessary pay the costs of a system that makes meritorious suit possible." J. Leubsdorf, *The Contingency Factor in Attorney Fee Awards*, 90 Yale L.J. 473 (1981).

#### e. Budget Constraints and Burden Shifting

■ Two further policy arguments are advanced for eliminating nonpayment multipliers. First, in the light of current government budgetary constraints, the reduction of nonpayment multipliers assessed against government defendants is a good way to reduce the deficit of the federal fisc. *See, e.g., Ashton v. Pierce*, 580 F.Supp. 440–444–45 (D.D.C.1984); *Nonpayment Risk Multipliers*, 53 U.Chi.L.Rev. at 1105. The flaw in this argument is that it posits false economies. The amount the federal government is forced to pay in attorneys' fees is miniscule compared to other portions of the federal budget. More importantly, an underlying purpose of the Fees Act is to create a network of "private attorneys general" to abet the enforcement of the nation's civil rights laws. Such a system saves the federal and state governments countless dollars that would otherwise be expended enforcing civil rights violations through government offices. In enacting § 1988, Congress determined that the public as a whole has an interest in vigorous enforcement of statutes enumerated under § 1988. Awarding attorneys' fees and multipliers help ensure vigorous civil rights enforcement at low cost. *See Hensley v. Eckerhart*, 461 U.S. 424, 444 n. 4, 103 S.Ct. 1933, 1945 n. 4, 76 L.Ed.2d 40 (Brennan, J., concurring).

■ The final argument propounded against nonpayment risk multipliers amounts to a burden shifting concept. This theory suggests that the incentive effects of nonpayment risk multipliers are sufficiently unclear at the moment to say whether more or less civil rights enforcement is required. 53 U.Chi.L.Rev. at 1105. *But see Yates v. Mobile County Personnel Bd.*, 719 F.2d 1530, 1534 (11th Cir.1983) (without a multiplier to encourage "highly skilled lawyers to take contingent fee civil

---

**22.** *See Nonpayment Risk Multipliers*, 53 U.Chi.L. Rev. at 1092, 1094 and 1099 (complains that the risk multiplier is "unfair to defendants.") It is ironic that a comment that uses law and economics methodology to attack multipliers relies on notions like "unfairness", a concept traditionally eschewed by law and economics scholars.

rights cases, the enforcement of our civil rights would then be entrusted to less capable and less successful lawyers who lack sufficient employment."). Because both the incentives effect of nonpayment multipliers are unclear, and because Congress' intent as expressed in the legislative history of the Fees Act is unclear, the contingency multiplier should be abandoned altogether. 53 U.Chi.L.Rev. at 1106.

Even assuming the legislative history is inconclusive, which this Court and this Circuit do not, it is not clear why the plaintiff's bar should bear the burden of proving that nonpayment risk multipliers provide powerful incentives. Why should not the defense bar bear this burden of proof? And to say that "case-by-case inconsistencies dilute the incentives a nonpayment risk multiplier theoretically should create" 53 U.Chi.L.Rev. at 1106, ignores the explicit language of § 1988 which allows the district courts in their "discretion" to allow fees. On this logic, all multipliers should be abandoned because their application is discretionary and their application will lead to inconsistencies. But some multipliers were clearly contemplated by Congress.

This Court remains unpersuaded by arguments against a multiplier to reflect the risk of nonpayment.

### 2. The Law In The Third Circuit

■ Regardless of the theoretical arguments for and against multipliers, the law in the Third Circuit expressly allows multipliers to account for the risk of nonpayment. In a recent opinion, the Third Circuit Court of Appeals permitted a multiplier to reflect the "contingent nature of plaintiff's success in a litigation that was unusual and that the court considered reflected the high quality of plaintiff's counsel's work. [A]lthough the Supreme Court considers it an open question whether contingency of success can properly justify a lodestar increase," notes the Third Circuit. "We have resolved the question in this court." [23] *Delaware Valley Citizens' Council v. Com. of Pa.*, 762 F.2d 272 (3d Cir.1985), *aff'd. in part, rev'd. in part, and restored to docket sub nom., Pennsylvania v. Delaware Valley Citizens' Council*, — U.S. —, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986), *citing Hall v. Borough of Roselle*, 747 F.2d 838, 844 (3d Cir.1984) (we conclude "that Congress authorized district courts to award upward adjustments to compensate for the contingent nature of success, and thus for the risk of nonpayment in a particular case," *citing Blum v. Stenson*, 465 U.S. at 903, 104 S.Ct. at 1551 (Brennan, J., concurring); *Lindy II* 540 F.2d at 117. This Court is bound by *Delaware Valley* to allow an award for nonpayment risk.

In the case at bar, defendant does not challenge plaintiff's assertion that his agreement with his client is nearly akin to a contingency fee arrangement.[24] Indeed,

---

**23.** *See also Hall v. Borough of Roselle*, 747 F.2d 838 n. 8 (3d Cir.1984) (legislative history may support upward adjustment in appropriate cases based upon contingency factor); *Burney v. Housing Auth. of Beaver*, 735 F.2d 113 (3d Cir. 1984) (upward adjustment based on contingency may be appropriate). And *see Jones v. Diamond*, 636 F.2d 1364, 1382 (5th Cir.1981) (en banc) ("Lawyers who are to be compensated only in the event of victory expect and are entitled to be paid more when successful than those who are assured of compensation regardless of the results"). And *see Blum v. Stenson*, 104 S.Ct. at 1550 (1984) (Brennan, J. concurring).

The reasoning of *Hall* and *Burney*, that a contingency multiplier is permissible under § 1988 was recently adopted by the Third Circuit's Task Force on Court Awarded Attorneys' Fees. "The Task Force feels that the contingen-

cy factor, which it defines simply as 'the risk of winning or losing', should be considered in all cases." *Court Awarded Attorney Fees*, 108 F.R.D. 237, 265 (1985). Plaintiff's attorneys always face the prospect of receiving no compensation in statutory fee cases. Accordingly, even modest risks in cases in which liability is reasonably certain to be established should be recognized in the fee-setting process. *Id.* at 265. *See also Leubsdorf, The Contingency Factor in Attorney Fee Awards*, 90 Yale L.J. 473 (1981).

**24.** The contingency factor in a § 1988 context is treated quite differently from a simple contingent fee arrangement in, for example, a private tort case. Notes Justice Brennan, "[c]ontingency adjustments under § 1988 should not be confused with contingency fee arrangements that are commonly entered into by private attorneys representing plaintiffs in civil litigation." An

it now appears that because plaintiff only prevailed on the motion for the injunction, he will not in fact be able to open his adult entertainment center to secure the income needed to pay his attorney. Although this retrospective analysis does not determine this motion for attorneys' fees, it suggests that the risk of nonpayment in this case may be not only perceived but real.

### 3. The Fee Arrangement

▮▮ In the case at bar, the fee arrangement between plaintiff and plaintiff's attorney is not a contingency agreement. But plaintiff's attorney avers that plaintiff does not have sufficient resources to satisfy his debt for legal fees. The plaintiff cannot now satisfy the legal judgment and has not in fact paid any of it. Robertson Aff., p. 12, ¶ 36. The fee agreement contemplated that if the plaintiff became a prevailing party, an application for attorneys' fees would be made under 42 U.S.C. § 1988. Robertson Aff., pp. 11–12, ¶ 33. The plaintiff only anticipated paying his attorneys' fees from the income he would receive from his adult entertainment center. Robertson Aff., p. 12, ¶ 35.

Although there was no contingency factor involved here, the evidence on the record reveals that plaintiff's attorney faced a significant risk of nonpayment. This risk of nonpayment is what plaintiff's attorney asks to be compensated for.

Moreover, the court have never held that the absence of an actual "contingent fee arrangement" will prevent a prevailing party from recovering a contingency multiplier.[25] *See Nonpayment Risk Multipliers*, 53 U.Chi.L.Rev. at 1076 n. 11, 1089 n. 88–92 (1986). Using the rubric of "contingency multipliers", courts include several concepts: for example, some courts allow a contingency multiplier because a litigation was hard fought or protracted. Mary Derner & Alan Wolf, *Court Awarded Attorney's Fees*, ¶ 16.04[2]c[ii] (1983); *Wildman*, 771 F.2d at 613.

For the foregoing reasons, the Court will assess a multiplier to reflect the risk of nonpayment. A multiplier of .115 will be allowed.[26] Combined with the .135 multiplier permitted to reflect the delay in payment, the total multiplier is .25. This is significantly below the .50 multiplier requested by plaintiff.

Using a base lodestar of $36,000, the total fee award permitted by the Court is $45,008.75.

### F. Costs

▮▮ Under Local Rule 6.1(A), it is mandatory for the plaintiff to serve and file his bill of costs within ten days after the issuance of the mandate of the Appellate court. Since the mandate of the Appellate Court was issued on June 6, 1986, plaintiff should have applied for costs no later than

---

upward adjustment to compensate for the risk of nonpayment under § 1988 is "entirely unrelated to the 'contingent fee' arrangements that are typical in plaintiffs' tort representations. In tort suits, an attorney might receive one-third of whatever amount the plaintiff recovers. In those cases, therefore, the fee is directly proportional to the recovery. Such is not the case in contingency adjustments of the kinds … describe[d] herein. Th[is] contingency adjustment is a percentage increase in the [amount obtained by multiplying hours expended by hourly rate, and is designed] to reflect the risk that no fee will be obtained." *Copeland v. Marshall*, 641 F.2d at 893; *Blum v. Stenson*, 465 U.S. at 903, 104 S.Ct. at 1551 (Brennan and Marshall, J.J. concurring), *citing Copeland v. Marshall*, 641 F.2d 880, 893 (1980) (en banc).

**25.** Neither does the Supreme Court restrict the award of an upward multiplier to situations where there is a contingency fee arrangement

between the prevailing plaintiff and the attorney. Instead, the court places its imprimatur on the Third Circuit's notion that the contingent nature of the case simply "reflect[s] the likelihood that hours were invested and expenses incurred without assurance of compensation. . . ." *Pennsylvania v. Delaware Valley Citizens' Council*, 106 S.Ct. at 3097, (the Supreme Court adopts a "hybrid approach" that includes both the Third Circuit's approach to the lodestar and the mode of proceeding under the *Johnson* factors).

**26.** In part, this low multiplier reflects the Court's skepticism about the risk of nonpayment to plaintiff's attorney. The Court notes that the attorney fee agreement was co-signed by a friend of the plaintiff, Anthony Trombetta. Robertson Aff., ¶ 34, p. 12.

Depending on whether Trombetta is a guarantor of the contract, this would reduce the risk to plaintiff's attorney.

June 17, 1986. This violation of the rule means that plaintiff has forfeited any right to costs. Rule 6.1(A) is written in mandatory terms so that plaintiff must comply with the rules. The rule states at 6.1(A)(1) "Failure to comply with the time limitations of this Rule shall constitute a waiver of costs." This mandatory language suggests that the reasoning of *Zentek* and *Pitts* apply to costs, even if they do not apply to attorneys' fees. *See* discussion, *supra.* Further, this interpretation would be most consistent with the holding of *White* that fees are to be distinguished from costs. *See* 455 U.S. 454 n. 17, 102 S.Ct. 1168 n. 17. (The district courts retain discretion under Rules 54(d) and 58 to deny even motions for costs that are filed with unreasonable tardiness.).

The discretion given the district courts under Rules 54(d) and 58 and the mandatory language of the Delaware local rules convinces this Court that the proper course of action is to deny plaintiff's request for costs. Plaintiff asked for costs in the amount of $749.40. Plaintiff's Opening Brief at 11. This is denied.

Plaintiff's Motion For Fees, but not costs, is granted.

An Order will enter in conformity with this Opinion.